Marcus Omar WINSTON, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–00–00987–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

March 28, 2002.

Rehearing Overruled June 6, 2002.

Cary Marshall Faden, Sugarland, for appellants.

John Harrity, III, Richmond, for appellees.

Panel consists of Justices YATES, EDELMAN, and WITTIG *.

## OPINION

LESLIE BROCK YATES, Justice.

A jury convicted appellant, Marcus Omar Winston, of burglary of a habitation and assessed punishment at six years' confinement and a $2,000 fine. In two points of error, appellant challenges the trial court's (1) denial of a motion under Texas Rule of Evidence 702 to exclude evidence of a scent lineup and (2) denial of appellant's motion for directed verdict based upon the scent lineup evidence. We affirm.

### Background and Procedural History

On May 18, 1999, the complainant's son called to tell her their home had been burglarized. When she got home, she noticed that the patio door had been shattered and that her son's Sony Playstation and Nintendo 64 were missing. Police investigated but were unable to lift a fin-gerprint. However, two days later, another residence two blocks away on Kearny Street was burglarized, and several items were disturbed. Deputy Pikett of the Fort Bend County Sheriff's Department brought his bloodhound, Quincy, to track a scent from the scene. Quincy trailed a scent from the second house to appellant's front door. Appellant was questioned about both burglaries. Deputy Pikett then obtained the location of the earlier burglary and drove Quincy to the complainant's house. Deputy Pikett testified that he gave Quincy a sample of the scent from the second house and Quincy located that same scent at the complainant's house, trailing it back to appellant's front door. Detectives later discovered a receipt with appellant's signature showing he pawned a Sony Playstation and a Nintendo 64 on the same day that the complainant's were reported missing. These pawned items were recovered and identified by the complainant's son as his property. Appellant was arrested and charged with burglary of the complainant's house.

In the presence of his attorney, appellant gave police a scent sample. Deputy Pikett then had Quincy and another bloodhound, Columbo, each compare the scent obtained from the Kearney Street dwelling to a "scent lineup" of five gauze pads, one of which contained appellant's scent sample. Over appellant's objection, Deputy Pikett testified that both bloodhounds "alerted" to the gauze pad containing appellant's scent. Deputy Pikett testified that he interpreted the dogs' actions as indicating a match between the scent obtained from the second house and appellant's scent.

The trial court denied appellant's pretrial motion to exclude the testimony regarding "the dog sniff." Appellant chal-

* Senior Justice Don Wittig sitting by assignment.

lenged the qualifications of Deputy Pikett as an expert as well as the admissibility of his testimony regarding "the dog sniff test" based on Texas Rule of Evidence 702. After presentation of Deputy Pikett's testimony at trial and after the State rested, appellant moved for directed verdict on the same grounds. The trial court denied this motion. The jury found appellant guilty of burglary of a habitation and assessed punishment at six years' confinement as well as a $2,000 fine. This appeal followed.

## Standard of Review

Since both of appellant's points of error deal with the admissibility of scent-lineup evidence under Texas Rule of Evidence 702,[1] we will combine these points of error in determining whether the trial court abused its discretion in admitting this evidence.

■ We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim. App.2000); *see also Kelly v. State*, 824 S.W.2d 568, 574 (Tex.Crim.App.1992). In determining the admissibility of evidence, the trial court is the sole judge of the weight and credibility of the evidence presented at the suppression hearing. *Weatherred*, 15 S.W.3d at 542. We will reverse only if the trial court's decision falls outside "the zone of reasonable disagreement." *Id.*

1. Appellant does not challenge the admission of evidence concerning Quincy's tracking of a scent from the two separate houses to appellant's house.

2. Factors that could affect a trial court's determination of reliability include, *but are not limited to*, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3)

## Analysis

■ Appellant claims that the trial court abused its discretion in allowing Deputy Pikett to offer testimony regarding the scent lineup. We must decide whether the court properly admitted expert testimony that described the purported identification by a trained police bloodhound of an individual based on his scent. The admission of expert testimony is governed by Texas Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

TEX.R. EVID. 702. The trial court's task in assessing admissibility under Rule 702 is to determine whether the expert testimony is sufficiently reliable and relevant to help the jury in reaching accurate results. *Kelly*, 824 S.W.2d at 572.

■ In *Kelly*, the Texas Court of Criminal Appeals set forth a three-prong reliability test and identified seven non-exclusive factors for courts to consider in assessing reliability of scientific evidence. *Id.* at 573.[2] Appellant suggests that the *Kelly* factors should be applied here. However, the Court of Criminal Appeals

the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573.

has adopted a less rigorous "translation" of the test set forth in *Kelly* for cases such as this one. *See Nenno v. State*, 970 S.W.2d 549, 560–61 (Tex.Crim.App.1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex.Crim.App.1999). In *Nenno*, the court stated that when addressing fields that are based upon experience or training as opposed to scientific methods, the appropriate questions for assessing reliability are (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of the field, and (3) whether the expert's testimony properly relies upon or utilizes the principles involved in the field. *Id.* at 561. Since interpretation of a dog's reaction to a scent lineup is based upon training and experience, and not scientific method, we apply the less rigorous *Nenno* test in this case. *See Brooks v. People*, 975 P.2d 1105, 1106 (Colo.1999) (holding canine scent-tracking evidence does not constitute evidence subject to *Daubert* scientific validation factors but that conventional Rule 702 and Rule 403 analysis should be applied).

### The *Nenno* Test

Appellant does not contest that the subject matter of Deputy Pikett's testimony falls within his purported field of expertise in dogs and scent discrimination. Our analysis therefore focuses on the first and third prongs of the *Nenno* test.

### Whether the Field of Expertise Is Legitimate

■ Under the first prong of the *Nenno* test, we must determine whether the proffered field of expertise is legitimate. Texas courts have recognized the admissibility of many types of dog-related evidence. *See Parker v. State*, 46 Tex.Crim. 461, 80 S.W. 1008, 1011 (1904) (recognizing admissibility of dog-tracking evidence); *Fitts v. State*, 982 S.W.2d 175, 184 (Tex.App.-Houston [1st Dist.] 1998, pet. ref'd) (recognizing admissibility of a dog's reaction to the presence of hydrocarbons for determining probable cause); *Walsh v. State*, 743 S.W.2d 687, 689 (Tex.App.-Houston [1st Dist.] 1987, pet. ref'd) (recognizing the use of drug-sniffing dogs for determining probable cause). However, Texas courts have not addressed the admissibility of dog-tracking evidence as direct evidence against an accused since *Parker*, which was decided prior to the current standards for expert testimony set forth in *Kelly* and *Nenno*. *See Parker*, 80 S.W. at 1011. Furthermore, we have found no Texas cases addressing the admissibility of a scent lineup.

The ability of certain breeds of dogs, especially bloodhounds, to distinguish humans by scent is well-documented. *See State v. Roscoe*, 145 Ariz. 212, 700 P.2d 1312, 1319–20 & n. 2 (1984); *Roberts v. State*, 298 Md. 261, 469 A.2d 442, 447 & n. 5 (1983). Further, these dogs' superior senses have long been used to aid mankind in a variety of contexts outside the courtroom, including "to track by scent escaped criminals or lost persons and articles." *People v. Price*, 54 N.Y.2d 557, 446 N.Y.S.2d 906, 431 N.E.2d 267, 269 (1981); *see Robinette v. Barnes*, 854 F.2d 909, 914 n. 6 (6th Cir.1988) (noting police "K–9" division's use of dogs to locate missing persons and lost or abandoned articles). Deputy Pikett started working with bloodhounds to track and find lost people. He and his bloodhounds have assisted the FBI, the Bureau of Alcohol, Tobacco, and Firearms, and various other law-enforcement agencies throughout Texas and across the nation to track individuals based on scent. This work included the use of scent lineups to eliminate potential suspects from an investigation. In one notable case involving a serial killer, the FBI noted in a letter to Deputy Pikett's

department that his work with the bloodhounds and scent lineups "saved many investigation man hours that would have been spent searching for the wrong person." Clearly, these dogs' ability to distinguish scents is valued and respected outside the context of the courtroom.

Thirty-seven states and the District of Columbia admit scent-tracking evidence to prove the identity of the accused, provided a proper foundation is laid. *See* Jay M. Zitter, Annotation, *Evidence of Trailing by Dogs in Criminal Cases,* 81 A.L.R.5th 563, 580–84 (2000). *But see id.* at 587 (identifying four states that have held dog-tracking evidence to be generally inadmissible). For purposes of judging the reliability of evidence based on a dog's ability to distinguish between scents, we believe there is little distinction between a scent lineup and a situation where a dog is required to track an individual's scent over an area traversed by multiple persons. *See Roberts,* 469 A.2d at 447–48. Accordingly, we conclude that the use of scent lineups is a legitimate field of expertise.

### Whether the Expert's Testimony Properly Relies Upon or Utilizes the Principles Involved in the Field

■ The third and most significant prong of the *Nenno* test requires the court to determine whether the proffered expert testimony properly relies upon or utilizes the principles involved in the field of expertise. Based on our review of opinions from other jurisdictions, we believe this determination turns in each case on three factors: (1) the qualifications of the particular trainer, (2) the qualifications of the particular dog, and (3) the objectivity of the particular lineup. *See, e.g., Cook v. State,* 374 A.2d 264, 270 (Del.1977) (recognizing the proper foundation for a dog's reliability for tracking purposes to be the experience and qualifications of the handler; the dog's experience, skill, training and reputation as a tracker; and the circumstances of the trailing itself).

■ We begin by addressing the trainer's qualifications. Deputy Pikett has worked with the Fort Bend County Sheriff's Department Canine Patrol for two years. He has worked with bloodhounds for eleven years. He has written articles for the *National Bloodhound Bulletin* and the *South Central Bloodhound Newspaper* and has attended about 160 seminar hours on bloodhound tracking. He has lectured during three seminars on the handling of bloodhounds. He has trained dogs for Texas Parks and Wildlife and the Houston, Bellaire, and Dallas Police Departments. As noted above, Deputy Pikett's services have been requested and used by the FBI, the ATF, and other state and local agencies. Deputy Pikett testified that two recognized experts in the field of bloodhound training have witnessed him in action and have approved his techniques and recommended him to others. Finally, Deputy Pikett stated that he has testified in eight to ten other trials as an expert in this field and his testimony has never been excluded.

■ Next, we examine the qualifications of the dog. As noted above, the majority of courts permitting scent-tracking evidence require that a proper foundation be laid before such evidence is admitted. We have utilized the requirements set forth in these cases, adapted slightly for use in scent lineups as opposed to tracking, as a guide for our determination of whether the dog is sufficiently qualified and reliable. We therefore conclude that a dog is "qualified" for a particular case if (1) the dog is of a breed characterized by acuteness of scent and power of discrimination, (2) the dog has been trained to discriminate between human beings by their scent, (3) by experience the dog has

been found to be reliable, (4) the dog was given a scent known to be that of the alleged participant in the crime, and (5) the dog was given the scent within the period of its efficiency. *See United States v. Gates*, 680 F.2d 1117, 1119 (6th Cir. 1982); *Brooks*, 975 P.2d at 1114.

Both of Deputy Pikett's dogs are AKC-registered bloodhounds. Appellant admits in his brief that the olfactory sense of the American bloodhound is legendary. Deputy Pikett, who holds a master's degree in chemistry, explained that when a person's skin cells are mixed with air and bacteria, each individual leaves a unique scent. He also gave extensive testimony on the training each of his dogs has received. He explained that both Quincy and Columbo were trained to follow first visual trails, and then "blind" trails of a person's scent left by human skin cells. The dogs are eventually trained to make "scent discrimination" in which they are taught to follow one scent, although they may encounter up to 100 different scents along a trail. Deputy Pikett's dogs are also trained by using a "false scent" in which one person runs and the dog is given a scent sample of another person. Deputy Pikett testified that he has run over 1,000 trails with his dogs.

Deputy Pikett testified that although his dogs have lost a scent, his dogs have never trailed a false scent. As an example of the dogs' success, he recounted one occasion when his dogs trailed the scent of a murder suspect through four inches of rain to a telephone. The accuracy of the trail was later confirmed by the suspect's fingerprints on the phone. One of his dogs, Columbo, has been doing scent lineups for seven-and-a-half years. Deputy Pikett testified that his dogs have never misidentified a scent in a scent lineup and that Quincy and Columbo have always identified the same person when both participated in a scent lineup. In support of his testimony, Deputy Pikett provided documentation detailing the success of every trail and scent lineup involving his dogs.

With respect to the scent used in this case, Deputy Pikett testified that he arrived at the Kearney Street residence shortly after the burglary. The homeowner told him a microwave had been moved. Deputy Pikett used a sterile gauze pad to wipe the scent from that microwave, placed it into a Ziploc bag, and labeled it. Each dog was later given the pad containing the scent from the microwave before being led to the scent lineup. There was no suggestion that the sample was contaminated. We conclude that the State properly established a foundation for Deputy Pikett's testimony based on his and the dogs' qualifications.

■ Finally, we consider the objectivity of the particular lineup used in this case. Appellant's scent sample was obtained in court by having appellant wipe his hands on a sterile gauze pad which was then placed in a Ziploc bag. Deputy Pikett explained the Ziploc bag was then labeled, placed in an envelope, and stored in a refrigerator. There is no suggestion this sample was contaminated. The next day, another detective set up a scent lineup consisting of five identical gauze pads, one containing the scent obtained from appellant in court and the other four containing scent samples from a person of the same race and gender as appellant. The five pads were placed ten paces apart, perpendicular to the wind so the scents would not cross. At no time was Deputy Pikett informed which gauze pad contained appellant's scent. Deputy Pikett testified that this procedure is consistent with the National Police Bloodhound Association's manual on how to conduct a scent lineup. Deputy Pikett then gave Columbo the scent sample from the crime scene. Columbo walked the line and was given a command at each pad "to check." Deputy

Pikett stated that Columbo walked the lineup of five scented gauze pads and "alerted" at position four. Deputy Pikett then had Quincy separately perform the same lineup and said she also alerted at position four. Deputy Pikett was later informed that appellant's scent was located in position four.

We find that the foundational requirements established in this case comply with the *Nenno* test and that the trial court did not abuse its discretion in admitting the scent-lineup testimony from Deputy Pikett. Accordingly, appellant's points of error are overruled.

The judgment of the trial court is affirmed.