Howard Forrest **RISHER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 01–05–00960–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 7, 2006.

Discretionary Review Refused April 25, 2007.

Mark A. Rubal, The Rubal Law Firm, Houston, TX, for Howard Forrest Risher.

Jessica A. McDonald, Assitant District Attorney, Houston, TX, for The State of Texas.

Panel Consists of Justices NUCHIA, JENNINGS, and HIGLEY.

## OPINION

SAM NUCHIA, Justice.

A jury convicted appellant, Howard Forrest Risher, of possession with intent to deliver more than 4 grams and less than 200 grams of cocaine, and assessed punishment at 50 years in prison. Appellant challenges the trial court's admitting the expert testimony of Officer D.L. Oglesby as an abuse of discretion. We affirm.

### Facts

Appellant agreed to sell Jackie Wilson, a police informant, two kilograms of cocaine. After two failed attempts, appellant met with Wilson outside of a Luby's restaurant on June 28, 2004. Wilson entered a car driven by Juan Martinez and with appellant in the back seat. After driving away from the restaurant, Martinez parked the car and proceeded to remove a bag from under the seat. He took out two brick-shaped objects wrapped in plastic and showed them to Wilson. Martinez then made a V-shaped cut in the wrapping of each brick and allowed Wilson to taste the substance.

After tasting the substance and identifying it as cocaine, Wilson informed appellant and Martinez that he would have to make a call in order to get the money to complete the transaction. Appellant and Martinez dropped Wilson off at a gas station across the street from the restaurant. Wilson proceeded to call Officer Gonzales, a member of the surveillance team, to in-form him about the deal. However, as Wilson was making the phone call, appellant got into the driver's seat of the car and, with Martinez in the back seat, sped away. Police officers, who in four or five unmarked cars had been monitoring the transaction, pursued appellant as he drove onto the freeway, and officers in two marked cars joined the chase. Appellant exited the freeway and drove into a residential neighborhood. He lost control of the car and crashed it into a utility pole.

The police pulled appellant and Martinez out of the car and searched it, but except for a small bag containing marijuana, found no other narcotics. Martinez told the officers that appellant had thrown the two bricks of cocaine out of the window during the chase. The officers searched the freeway where the chase had occurred and found two bricks of cocaine near the intersection where appellant had left the freeway. The plastic wrapping around each brick had a V-shaped cut. Wilson identified the bricks as those he had seen in appellant's possession. Gonzales testified that, to link the bricks of cocaine to appellant and Martinez, he called Oglesby, a canine handler, to perform a human-scent lineup.

After arriving on the scene, Oglesby prepared a scent pad by dropping a sterile gauze pad into the plastic bag where the police officers had placed the bricks of cocaine. He then directed appellant, an African–American, and five Caucasian police officers to form a lineup. After the six men were in place, Oglesby retrieved his bloodhound, Lucy, from his truck and let her sniff the scent pad. On Oglesby's signal to start, Lucy went directly to the lineup and, when she got to appellant, stopped and touched her nose to him. Oglesby testified that this was how Lucy was trained to do her alert.

The trial court held a hearing the day before trial to hear appellant's objections to Oglesby's testimony regarding the scent lineup.[1] At the close of the hearing the judge ruled that he would allow Oglesby's testimony.

### Admissibility of Expert Testimony

In his sole point of error, appellant contends that the trial court erred in admitting the expert testimony of Oglesby. Specifically, he argues that Oglesby lacked the qualifications to conduct a human-scent lineup, that Lucy was not a reliable scent trailer, and that the lineup was not objective.

### A.   Standard of Review

We review a trial court's decision to admit or exclude scientific testimony for abuse of discretion and will uphold the ruling if it is within the zone of reasonable disagreement. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex.Crim.App.2002). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim.App.1990) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985) as stating appropriate test for abuse of discretion).

The Court of Criminal Appeals has held that rule 702 of the Texas Rules of Evidence requires the satisfaction of a three-part test before expert scientific testimony is admissible. *See Kelly v. State*,

824 S.W.2d 568, 573 (Tex.Crim.App.1992) (holding that admissibility of novel scientific evidence was governed by three-part reliability test: (1) scientific theory must be valid, (2) application of theory must be valid, and (3) technique must have been properly applied); *Hartman v. State*, 946 S.W.2d 60, 62–63 (Tex.Crim.App.1997) (applying Kelly requirements to all scientific evidence, whether or not it was novel).[2] In determining reliability, courts consider factors such as (1) whether the theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review or publication, (3) the known or potential rate of error, and (4) general acceptance within the relevant scientific community. *Nenno v. State*, 970 S.W.2d 549, 560 (Tex.Crim.App.1998), *overruled on other grounds, State v. Terrazas*, 4 S.W.3d 720 (Tex.Crim.App.1999). In *Nenno*, the Court of Criminal Appeals explained that these factors do not necessarily apply outside of the hard sciences, and that the appropriate questions in considering the reliability of other fields are (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon or utilizes the principles involved in the field. *Nenno*, 970 S.W.2d at 561.

### B.   Discussion

Appellant relies on the third prong of the *Nenno* test to challenge the admissibility of Oglesby's expert testimo-

---

1.   The trial court referred to the hearing as a *Daubert* hearing, although there was no written motion or objection to the testimony, and no oral motions or objections concerning Oglesby's testimony appear in the record. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–92, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993).

2.   Rule 702 of the Texas Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R. Evid. 702.

ny. Extrapolating from opinions of other jurisdictions regarding the admission of scent-lineup evidence, the Fourteenth Court of Appeals set out three factors to determine whether the third prong is satisfied. *Winston v. State*, 78 S.W.3d 522, 526–27 (Tex.App.-Houston [14th] 2002, pet. ref'd). The three factors are: (1) the qualifications of the particular trainer, (2) the qualifications of the particular dog, and (3) the objectivity of the particular lineup. *Id.* at 527.

### 1. *The Qualifications of Oglesby*

■ Appellant contends that Oglesby was not qualified to conduct a human-scent lineup because he did not meet the qualifications of Deputy Pikett, the canine officer in *Winston*. Pikett had 11 years experience working with bloodhounds, had written articles on the subject, attended 160 seminars on bloodhound tracking, lectured in three seminars, had trained dogs for other police departments, had been used by the FBI, ATF, and other agencies, had been observed by two recognized experts in the field who approved his techniques and recommended him to others, and had testified in eight to ten trials. *Id.*

Our task is not to compare the qualifications of different trainers, but to determine whether the qualifications of the particular trainer in the present case meets the *Nenno* test. At the suppression hearing, Oglesby testified that he had handled canines for the Bellaire Police Department for 12 years. He had worked first with a Labrador retriever that was a narcotics dog and then, for eight years, with a bloodhound, Lucy, that was a human-scent dog. He also testified that he had attended training schools for handling human-scent dogs twice a year for three years and was also trained by Pikett, the deputy who testified in the *Winston* case. Oglesby further testified that he had given instruction to other officers or canine handlers in "trailing and bloodhound training" and

that his skills in conducting human-scent lineups had been used by at least 30 other law enforcement agencies.

### 2. *The Qualifications of the Particular Dog*

■ The *Winston* court concluded that a dog is qualified if "it (1) is of a breed characterized by acuteness of scent and power of discrimination, (2) has been trained to discriminate between human beings by their scent, (3) has been found by experience to be reliable, (4) was given a scent known to be that of the alleged participant of the crime, and (5) was given the scent within the period of its efficiency." *Id.* at 527–28. Appellant contends that the State did not establish Lucy's reliability because Oglesby did not testify to her success rate or to whether or not she had misidentified anyone. Appellant also argues that Lucy's health problems caused her to be unreliable.

Oglesby testified that Lucy had participated in 74 lineups and had successfully identified the suspect in 63 of them. The remaining 11 were "no starts," meaning that the person she was to identify was not in the lineup. Oglesby testified that, to his knowledge, Lucy had not misidentified anyone in a lineup.

Oglesby testified that, "sometime around May" of that year, Lucy had begun having health problems. She was gaining and losing weight, and the veterinarian had put her on medication. Oglesby testified that he continued doing trails and lineups with Lucy and saw no decline in her ability, except that she was a little slower. He further testified that there was no indication that her medication interfered with her ability to trail a human scent.

### 3. *The Objectivity of the Particular Lineup*

■ Appellant contends that the lineup was not objective because Oglesby did not

conduct a lineup using only scent pads, as conducted by Pikett in *Winston.* Oglesby testified that he has a set procedure for conducting scent lineups and that he learned the method at one of the schools he had attended. He further testified that he was aware of the scent-pad-only lineup, but that he considered the live lineup to be more accurate.

Appellant also asserts that the lineup was not objective because not everyone in the lineup was of the same race. Oglesby testified that it did not make a difference that the individuals in the lineup were not of the same race. When counsel suggested that the National Bloodhound Association's manual said that it was best to have people of the same race in the lineup, Oglesby agreed, but said it was not always possible.

Finally, appellant contends that the lineup was not objective because appellant was the only person in the lineup wearing handcuffs. Oglesby's testimony that the handcuffs did not affect the objectivity of the lineup was not controverted.

### Conclusion

Applying the *Winston* factors, we conclude that the trial court could have reasonably concluded that Oglesby was qualified to testify as a canine handler for scent tests, the dog was qualified to perform scent tests, and the lineup was sufficiently objective to be reliable. Accordingly, we hold that the trial court did not abuse its discretion in admitting the testimony of Officer Oglesby regarding the scent lineup. We overrule appellant's sole point of error.

We affirm the judgment.