Opinion filed June 11, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed June 11,
2009

 

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                                                          No. 11-08-00034-CR

                                                    __________

 

                            RICHARD LYNN WINFREY SR., Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                         On
Appeal from the 411th District Court

 

     San
Jacinto County, Texas

 

                                                     Trial
Court Cause No. 9525

 



 

                                                                   O
P I N I O N

The jury convicted Richard Lynn Winfrey Sr. of the
offense of murder.  Appellant entered pleas of true to two enhancement
allegations, and the jury assessed his punishment at confinement for
seventy-five years.  In two appellate issues, appellant challenges the legal
and factual sufficiency of the evidence to support his conviction.  We affirm.








                                                                   Background

A person commits the offense of murder if he Aintentionally or knowingly causes the death of an individual.@  Tex. Penal Code Ann. ' 19.02(b)(1) (Vernon 2003).  A person commits the offense of capital
murder if he commits the offense of murder as defined in Section 19.02(b)(1)
and he Aintentionally commits the murder in the course of
committing or attempting to commit . . . robbery.@  Tex. Penal Code Ann. ' 19.03(a)(2) (Vernon Supp. 2008).  Appellant was indicted for the
offense of capital murder.  The indictment alleged that, on or about August 6,
2004, appellant Aintentionally cause[d] the death of . . . MURRAY
WAYNE BURR, by beating him with his hands and fists and by stabbing him with a
knife,@ while  appellant was Ain the course
of committing or attempting to commit the offense of robbery of MURRAY WAYNE
BURR.@  The jury convicted appellant of the lesser
included offense of murder.

                                                            Standards
of Review

To determine if the evidence is legally sufficient,
we must review all of the evidence in the light most favorable to the verdict
and determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319 (1979); Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim.
App. 2007); Jackson v. State, 17 S.W.3d 664, 667 (Tex. Crim. App.
2000).  To determine if the evidence is factually sufficient, the appellate
court reviews all the evidence in a neutral light.  Watson v. State, 204
S.W.3d 404, 414 (Tex. Crim. App. 2006) (overruling in part Zuniga v. State,
144 S.W.3d 477 (Tex. Crim. App, 2004)); Johnson v.  State, 23
S.W.3d 1, 10-11 (Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404,
407-08 (Tex. Crim. App. 1997); Clewis v. State, 922 S.W.2d 126, 129
(Tex. Crim. App. 1996).  Then, the reviewing court determines whether the
evidence supporting the verdict is so weak that the verdict is clearly wrong
and manifestly unjust or whether the verdict is against the great weight and
preponderance of the conflicting evidence.  Watson, 204 S.W.3d at
414-15; Johnson, 23 S.W.3d at 10-11.  The jury, as the finder of fact,
is the sole judge of the weight and credibility of the witnesses= testimony.  Tex. Code Crim.
Proc. Ann. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).








                                                           The
Evidence at Trial

Murray Wayne Burr worked as a janitor for the
Coldspring Independent School District for about thirty years.  He planned to
retire in January 2005.  He lived alone in a trailer house at 851 Willow
Springs Road in San Jacinto County, Texas.  Steven Ray Winfrey, who was
appellant=s second cousin, lived across the road from Burr. 
Late in the afternoon on Thursday, August 5, 2004, Steven Winfrey saw Burr
sitting outside of his house petting a cat.  One of Burr=s grandnephews saw Burr at about 8:00 p.m. that night.  On Friday
morning, August 6, 2004, Burr=s sister, Dorothy McFadden, dropped her
grandchildren off at Burr=s house to visit him.  Her grandchildren later told
her that Burr would not answer the door.  She drove by Burr=s house that night and noticed that all the lights were on in the
house.  On Saturday morning, August 7, 2004, McFadden went to Burr=s house with her mother, three of her sisters, and a granddaughter. 
They knocked on the doors and windows, but there was no answer.  McFadden had a
key to the house, and she opened the door.  She testified that she saw a Adrag mark@ of blood, and she discovered Burr deceased in the
bedroom.  Burr had been brutally beaten and had been stabbed multiple times.  Burr=s house had not been ransacked, and the only thing that Burr=s family members reported missing was a Bible that had been on the
entertainment center.

On
August 7, 2004, San Jacinto County Sheriff Lacy Rogers received a call about
Burr=s murder.  He
went to Burr=s house
after receiving the call.  Sheriff Rogers testified that there was blood in the
living room, that there was a drag mark of blood that went through the kitchen,
and that Burr=s body
was located in the bedroom.  Sheriff Rogers contacted the Texas Rangers and the
Department of Public Safety crime scene unit about the homicide, and he turned
the scene over to Texas Ranger Sergeant Grover F. Huff.








Ranger
Huff arrived at the scene the same day.  He testified that there was no
evidence of forced entry into Burr=s
house.  Ranger Huff examined blood spatter evidence at the scene.  The blood
spatter evidence indicated that blows had been delivered to Burr in the living
room and in the bedroom.  Ranger Huff testified that there were bloodstains on
the wall and furniture in the living room, the wall and various objects in the
bedroom, and clothes hanging in the bedroom closet.  He also testified that,
based on the existence of a blood drag mark leading from the living room to the
bedroom where Burr=s
body was discovered, Burr had been dragged from the living room to the
bedroom.  Ranger Huff saw what he believed to be a bloody partial fingerprint
or palm print on the front doorknob of the house.  He removed the doorknob, and
it was sent to the Montgomery County Sheriff=s
crime laboratory for testing.  The crime laboratory found no identifiable
fingerprints on the doorknob.

Also
on August 7, 2004, personnel from the DPS Crime Laboratory in Houston collected
evidence from the crime scene for DNA testing and analysis.  They collected
swabs of representative samples from the bloodstains, a hair that was found on
Burr=s pants, hairs
from a vacuum cleaner, a hair that was in the bloody drag mark in the kitchen,
and other objects from the house.

On
August 8, 2004, Ana Lopez, an assistant medical examiner for Harris County,
performed an autopsy on Burr.  She testified that Burr had a significant amount
of blood and trauma on his face and that he had sharp-force and blunt-force
injuries.  The majority of Burr=s
injuries were located on his face, neck, and head.  Lopez said that Burr had
sustained twenty-eight sharp-force injuries, which included both stab wounds
and incised wounds.  Lopez explained that Burr=s
stab wounds and incised wounds had sharp ends and blunt ends and that,
therefore, the wounds were consistent with the use of a knife with a sharp edge
and a blunt edge.  Lopez testified that the fatal wound involved the left
internal jugular vein and the left external carotid artery.  Burr also received
multiple blunt-force injuries, including at least ten different lacerations or
skin tears on his face and scalp.  Burr=s
right eye orbital was broken and both sides of his jaw were broken.  Lopez
ruled the manner of death a homicide.

Sheriff
Rogers testified that he received information leading him to believe that
appellant=s children,
Megan Winfrey and Richard Winfrey Jr., were persons of interest in the
investigation.  At that time, Megan Winfrey was sixteen years old and Richard
Winfrey Jr. was seventeen years old.  The Winfreys lived at 1400 Winfrey Road,
which was about one and one-half to two miles away from Burr=s house.  Sheriff Rogers
focused on Megan Winfrey and Richard Winfrey Jr. as possible suspects.  Ranger
Huff testified that Richard Winfrey Jr., Megan Winfrey, and Megan Winfrey=s boyfriend Christopher
Hammond became the focus of the investigation and that Adam Szarf, who was
Hammond=s friend, was
also investigated.








On
August 16, 2004, Ranger Huff interviewed appellant.  Ranger Huff testified
that, at that time, appellant was not a person of interest and that he did not
consider appellant to be a suspect.  Ranger Huff questioned appellant about the
activities of his children.  During the interview, appellant told Ranger Huff
that he had not been involved in the murder, that he did not believe his
children had been involved in the murder, that he had not seen Burr in four or
five years, and that he had never been in Burr=s
home.  Appellant stated to Ranger Huff that Ahe
was the number one suspect.@

Ranger
Huff also interviewed Richard Winfrey Jr. and Megan Winfrey.  They told him
that they had nothing to do with the murder.  They also told him that they had
been to Burr=s house
on several occasions.  On August 16, 2004, Ranger Huff collected buccal swabs
from Richard Winfrey Jr., Megan Winfrey, Christopher Hammond, and Adam
Szarf.  Ranger Huff also obtained shoelaces from a pair of Christopher Hammond=s tennis shoes.  The buccal
swabs and shoelaces were submitted to the DPS Crime Laboratory for testing.

Ranger
Huff contacted Fort Bend County Deputy Sheriff Keith Pikett about performing a
scent lineup.  Deputy Pikett testified that he specialized as a canine handler
and that he trained and worked with bloodhounds.  He also testified in detail
about the training received by his bloodhounds in tracking human scents and
performing human scent lineups.  Deputy Pikett said that he had been certified
as an expert on bloodhound trails.  He had worked regularly with the FBI, and
he had also worked with the ATF, the US Marshals, and the DEA.  Deputy Pikett
had instructed others regarding the use of bloodhounds and scent evidence.  He
testified that bloodhounds have the biggest olfactory receptors, which makes
them good for scent lineups and tracking, and that bloodhounds have the best
scent capabilities of dogs.  He said that, as a conservative estimate, human
beings probably lose about fifteen million skin cells a day and that these skin
cells are what a dog is smelling.

Before
a scent lineup is conducted, gauze pads are used to collect scent samples from
individuals and objects.  Gauze pads containing scent samples are maintained in
sealed Ziplock bags.  Deputy Pikett explained the procedure for conducting
scent lineups.  Six quart-sized paint cans with numbers on them are placed in a
line on the ground about ten walking steps apart.  The cans are placed in a
crosswind so that scents from the cans do not blow toward other cans.  A
Ziplock bag containing a scent pad (scent sample) is opened and placed in each
can.  Deputy Pikett had a large selection of scent samples that he used in
conducting scent lineups.  He had the scent samples separated by race and
gender, and he separated his scent lineups by race and gender.








Ranger
Huff obtained instructions from Deputy Pikett about how to obtain scent
samples. After receiving instructions from Deputy Pikett, Ranger Huff obtained
scent samples from the clothing that Burr was wearing at the time of the
murder.  During his testimony, Ranger Huff explained the process that he used
to obtain the scent samples from the clothing.  Ranger Huff wore latex gloves
while obtaining the samples.  He touched gauze pads to Burr=s clothing and then placed
and sealed the gauze pads in Ziplock bags.  Ranger Huff also collected scent
pads from Richard Winfrey Jr., Megan Winfrey, Christopher Hammond, and Adam
Szarf.

On
August 24, 2004, Deputy Pikett conducted scent lineups in a vacant lot near the
sheriff=s office in
Coldspring, Texas.  Ranger Huff set up the cans for the lineups in accordance
with instructions that he had received from Deputy Pikett.  Deputy Pikett gave
Ranger Huff scent pads from non-suspects to be used in the lineups, and Ranger
Huff used the scent pads that had been collected from Richard Winfrey Jr.,
Megan Winfrey, Christopher Hammond, and Adam Szarf.  Three different lineups
were conducted on August 24, 2004.  In each of the lineups, Ranger Huff placed
the scent pads in the cans, and Deputy Pikett did not know the locations of the
scent pads within the cans.  Texas Ranger Ronald Duff videotaped the lineups,
and the videotape was played during Deputy Pikett=s
testimony.  Deputy Pikett testified about what was shown in the videotape. 








Deputy
Pikett used two dogs B
Quincy and Jag B to
conduct the scent lineups.  Quincy and Jag sniffed the gauze pads that Ranger
Huff had used to obtain the scent from Burr=s
clothing.  The dogs then walked the line of cans containing the scent pads. 
The positions of the people in the first lineup were D. Cole in Position No. 1;
Christopher Hammond in Position No. 2; P. Reed in Position No. 3; Richard
Winfrey Jr. in Position No. 4; H.  Bunning in Position No. 5; and R. Holman in
Position No. 6.  The second lineup involved Megan Winfrey=s scent pad and scent pads
of five other white females.  Ranger Huff placed Megan Winfrey=s scent pad in Position 6. 
The third lineup involved Adam Szarf=s
scent pad and scent pads of five other white males.  In the first lineup,
Quincy and Jag alerted on the can in Position No. 4, which contained the scent
pad of Richard Winfrey Jr.  The dogs did not alert on Christopher Hammond=s scent pad, which was in
the can in Position No. 2.  In the second lineup, the dogs alerted on the can
at Position No. 6, which contained Megan Winfrey=s
scent pad.  The dogs did not alert on any of the cans during the lineup
involving Adam Szarf.  Based on the results of the lineups, Deputy Pikett
concluded that Richard Winfrey Jr. and Megan Winfrey had left their scents on
the clothing that Burr was wearing at the time of his murder.

Personnel
from the DPS Crime Laboratory in Houston prepared eight reports related to the
processing of evidence that had been submitted to the laboratory for testing
and analysis.  Robin Freeman, the DNA supervisor at the DPS Crime Laboratory in
Houston, testified about the test results.  She said that a DNA profile
obtained from the items tested was consistent with Burr=s DNA profile.  She also said that a DNA
profile obtained from the hair that was found on Burr=s body was consistent with an unknown female. 
Law enforcement personnel obtained hair samples from a number of females,
including Burr=s
sisters, in an attempt to match them with the profile of the unknown female. 
The samples were tested at the DPS Crime Laboratory, and no match was found to
the unknown female.  Freeman also testified that Richard Winfrey Jr., Megan
Winfrey, Christopher Hammond, and Adam Szarf were excluded as possible sources
of the DNA evidence that had been obtained.  In summary, none of the items
tested at the DPS Crime Laboratory tied appellant to the murder scene. 

Sheriff
Rogers testified that he received a break in the case on July 14, 2006, when he
and San Jacinto County Deputy Sheriff Lenard Johnson interviewed David Wayne
Campbell at the Montgomery County Jail.  Campbell and appellant had been cell
mates in the Montgomery County Jail.  Campbell testified that, during summer
2006, he advised jail personnel that he had possible information about a
murder.  According to Campbell, appellant told him things that he had heard
about a murder.  Appellant described a murder that had taken place at Burr=s house and how it had
occurred.  Appellant told Campbell that there had been people at Burr=s house and that Asomebody [had] unlocked the
backdoor as a passageway to let somebody in.@ 
Appellant indicated to Campbell that Burr had been beaten and stabbed and that
his body had been moved.  Campbell testified that he believed appellant
indicated Asome kind
of a gun and some knife collection@
had been taken from Burr=s
house.  Appellant did not tell Campbell that he had been involved in Burr=s murder.  Campbell
testified that appellant=s
main concern had been about his children.  Appellant told Campbell that San
Jacinto County Sheriff=s
Department had arrested or was going to arrest his children.  At the time of
trial, Campbell was incarcerated in the Federal Detention Center in
Houston.               








Sheriff
Rogers testified that, before he interviewed Campbell, law enforcement
personnel were not aware that guns had been taken from Burr=s house.  The only thing
that Burr=s family had
discovered missing after the murder was Burr=s
Bible.  After receiving the information about the guns, Sheriff Rogers
conducted a follow-up investigation by contacting several of Burr=s family members, including
Burr=s brother-in-law,
Jessie Oates.  Oates testified that, in summer 2006, the sheriff=s office asked him if he
could identify the guns that Burr had owned.  Oates said that Burr had owned a
.22 semi-automatic rifle and a single-shot shotgun.  Oates said that Burr had
shown him the guns a few months before the murder.  Oates did not know whether
the guns were in Burr=s
house at the time of the murder.  Burr=s
family members did not find any guns in the house after the murder.  Sheriff
Rogers testified that law enforcement personnel conducted a search for the guns
but did not find them.  As a result of Sheriff Rogers=s interview of Campbell, appellant became a
primary focus of the investigation.  Sheriff Rogers testified that an arrest
warrant was issued for appellant for the capital murder of Burr.  Appellant,
Richard Winfrey Jr., and Megan Winfrey were all arrested on capital murder
charges.

On
August 22, 2007, Deputy Pikett conducted another scent lineup.  The lineup
involved a scent sample that had been obtained from appellant and the scent
sample that Ranger Huff had obtained from Burr=s
clothing.  Ranger Duff participated in the scent lineup.  The lineup was
conducted near the Bellaire Police Department in Bellaire, Texas, on a baseball
field.  Deputy Pikett set the scent lineup cans on the third base foul line and
provided Ranger Duff with five scent samples of white males.  Ranger Duff
testified that Deputy Pikett walked behind his vehicle so that he would not
know where the scent samples were being placed.  Ranger Duff placed the scent
pads in the cans. He placed appellant=s
scent pad in the can at Position No. 4.  He testified that the scent samples
were contained in Ziplock plastic bags and that he opened the bags after
placing them in the cans.  Deputy Pikett testified that he did not know the
location of appellant=s
scent sample before the dogs performed the lineup.  Lamar Jones, an
investigator for the San Jacinto County District Attorney=s Office, videotaped the
lineup, and the videotape was played for the jury during Deputy Pikett=s testimony.  Deputy Pikett
testified about what was depicted in the videotape.








Deputy
Pikett used three dogs B
James Bond, Quincy, and Clue B
to conduct the scent lineup.   Ranger Duff pre-scented the dogs on the scent
samples that had been obtained from Burr=s
clothing.  All three dogs alerted on the can in Position No. 4, which contained
appellant=s scent
sample.  Based on the results of the scent lineups, Deputy Pikett concluded
that appellant=s scent
was on the clothing Burr was wearing at the time of his death.

Deputy
Pikett also provided testimony about the reliability of his dogs.  He testified
that they were extremely accurate.  Quincy had performed 1,483 scent pad
cases.  Early in her career, Quincy was wrong in two of her identifications. 
In the last six or seven years, Quincy had not been proved to be wrong on any
occasion.  James Bond had performed 964 scent pad lineups and had not been
proved to be wrong on any occasion; Jag had performed 413 scent pad lineups and
had not been proved to be wrong on any occasion; and Clue had performed 406
scent pad lineups and had not been proved to be wrong on any
occasion.                      

Defense
counsel questioned Deputy Pikett about transferred scent.  Deputy Pikett
testified that it is possible for human beings to transfer scents, such as by
shaking hands.  He also testified that, in conducting scent lineups, the dogs
were looking for Asignificant
physical contact.@  In
the absence of physical contact between people, Deputy Pikett doubted that the
dogs could detect one person=s
scent on the other person.  Deputy Pikett thought that boyfriends and
girlfriends, such as Megan Winfrey and Christopher Hammond, would have more
physical contact between each other than family members, such as appellant,
Richard Winfrey Jr., and Megan Winfrey, would have with each other.  Although
Megan Winfrey and Christopher Hammond may have had physical contact with each
other as boyfriend and girlfriend and transferred their scents to each other,
the dogs did not alert on Christopher Hammond=s
scent pad in the first scent lineup.  Therefore, Deputy Pikett believed that
Christopher Hammond did not have significant enough contact with Burr to have
left his scent on Burr=s
clothing.

                                                                        Analysis








Although
appellant told Ranger Huff that he had not seen Burr in four or five years and
that he had never been in Burr=s
home, the results of the August 22, 2007 scent lineup showed that appellant=s scent was on the clothes
that Burr was wearing when he was murdered.  Deputy Pikett=s canine scent testimony
provided direct evidence placing appellant in contact with Burr=s clothing.[1] 
Deputy Pikett testified in detail about the training and reliability of his
bloodhounds, and the jury viewed the videotape of the lineup.  All three of the
dogs alerted on appellant=s
scent during the lineup.  Based on the scent-lineup evidence, the jury could
have reasonably concluded that appellant was in Burr=s house at the time of the murder and that he
had significant physical contact with Burr.  The lack of DNA evidence
connecting appellant to the murder did not require the jury to conclude that he
did not commit the murder.  See Tinker v. State, 148 S.W.3d 666, 669
(Tex. App.CHouston
[14th Dist.] 2004, no pet.) (The lack of DNA or other physical evidence did not
render the evidence factually insufficient to support the defendant=s conviction.).

Appellant
told Campbell that Asome
kind of a gun and some knife collection@
had been taken from Burr=s
house.  Before Sheriff Rogers=s
interview of Campbell, the police had no information that guns had been taken
from the house.  Thus, appellant shared information about the murder with
Campbell that was not even known by the police.  Under this circumstance, the
jury may have reasonably concluded that such information would only be known by
the murderer or murderers.  Additionally, appellant identified himself as the Anumber one suspect@ in the murder at a time when
the police did not consider him to be a suspect.

After
reviewing all the evidence, we hold that the evidence is legally and factually
sufficient to support appellant=s
conviction.  We overrule appellant=s
issues.

                                                               This
Court=s Ruling

We
affirm the judgment of the trial court.  

 

 

TERRY McCALL

JUSTICE

June 11, 2009

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.                                            









[1]In Winston v. State, 78 S.W.3d 522 (Tex. App.CHouston [14th Dist.] 2002, pet. ref=d), the court held that Deputy Pikett=s scent-lineup testimony was reliable and, therefore,
admissible.