Opinion issued May 24, 2007

 













In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00646-CR






FRANK JOSE TREJOS, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 400th District Court

Fort Bend County, Texas

Trial Court Cause No. 37404






O P I N I O N

 Appellant, Frank Jose Trejos, appeals a judgment convicting him of the murder
of Maria Barrientos, his mother-in-law. See Tex. Pen. Code Ann. § 19.02(b)(1)
(Vernon 2003). Appellant pleaded not guilty to the jury. The jury found him guilty
and assessed punishment at 45 years in prison. In seven issues, appellant contends
that the trial court erred (1) by granting the State's motion to shuffle the venire panel
because the motion was untimely after voir dire had commenced, (2) by granting the
State's motion to amend the indictment to add the name of the complainant on the day
of trial, (3) by admitting his statements that he made to police officers, (4) by
admitting testimony concerning the findings of cadaver dogs because there was no
showing of the reliability of the dogs or, alternatively, the probative value of the
testimony was outweighed by its prejudicial effect or the danger of confusing the
issues, and (5) by denying his motion for instructed verdict because "the State failed
to prove corpus delicti." We conclude that the State's motion to shuffle was timely
because it was made before the State began its voir dire. We also conclude that the
trial court's amendment of the indictment to add the name of the complainant on the
day of trial was harmless error. Further, we conclude that the trial court did not err
by admitting appellant's statements to officers, by admitting the evidence regarding
the cadaver dogs, or by denying appellant's motion for instructed verdict. We
therefore affirm.

Background

 In 1994, appellant and his wife live withed Maria Barrientos, his mother-in-law. On June 10, 1994, after she was paid for her work as a nanny, Maria left work
at 5:00 p.m., and was never seen again. According to her employer, she was not ill
and she did not quit. The next day, when Margarita Torres called Maria's house to
speak with her, appellant told her that that Maria left because she was angry with him
for not mowing the lawn.

 Four days after Maria was last seen, appellant reported to the police that she
was missing, but neither he nor his wife helped Maria's friends post missing persons
fliers, nor did they make any other attempts to find her. Detective Glenn White of the
Sugar Land Police Department was assigned to Maria's case two days after the report
was filed. His investigation did not reveal any activity with her work or church. 
Maria's bank account had a small balance remaining and there was no activity in that
account, even though Maria did not have much money. And although she was known
to take her bible with her everywhere, Detective White found it in her house.

 On June 29, the Houston Police Department Crime Laboratory processed
Maria's house. Testing revealed a "presumptive test for blood" on adult footprints
in the kitchen and the hallway and on a towel in the bathroom. (1) The towel was sent
to the Department of Public Safety ("DPS") for follow-up testing, but the test showed
that there was no "apparent blood." (2) The following day, Maria's car, with the keys
still in the ignition, was found abandoned less than two miles from her ex-husband's
house. Maria's purse was in the car. A presumptive test showed the presence of
possible blood on the floormats in the back floorboard of the car.

 In July 1994, appellant, who appeared casual and nonchalant, met with police
officers to discuss Maria's disappearance. According to appellant, he last saw Maria
asleep at her house, when he and his wife left the house at around 9:30 or 10:30 p.m.
on Friday, June 10. Appellant reported that, when he and his wife returned to the
house, the door to the house was ajar, Maria's car was missing, and Maria was gone. 
Appellant laughed when asked what was the last thing he heard Maria say. When
asked where he went on the evening of June 10, appellant gave detailed directions
rather than stating a general destination. Appellant also stated that Maria had mopped
her kitchen floor. However, the floor was being re-tiled and was concrete. Also,
everywhere that appellant said that Maria had mopped "presumptively tested
positive" for blood.

 In November 2001, seven years after Maria disappeared, Detective White asked
DPS Sergeant Enrique Muniz for assistance in the investigation. On November 7,
Sergeant Muniz, Detective White, and other officers went to appellant's apartment. 
They told appellant that they wanted to talk to him about the case and that he was not
under arrest, and they asked him to come to the Sugar Land Police Department. 
Appellant agreed. Because he did not have a car, appellant rode with Muniz in an
unmarked pickup truck. Once at the Department, appellant and the officers went into
an office in a temporary, portable building because the Department was being re-modeled. Detective White told appellant that he was free to leave. Appellant then
gave a statement that was recorded on audio tape. On the tape, appellant
acknowledged that he had been read his "Miranda warning" (3) before the recording
started. (4)

 In his statement, appellant said that he was angry with Maria for nagging him. 
When she "came up in [his] face" he struck her with his fist. She fell to the kitchen
floor. Maria was bleeding and "freaking out," so appellant choked her. After Maria
was dead, appellant and his wife took her to the bathroom and placed her in the tub. 
Appellant's wife cut Maria's wrists to try to make it look like she committed suicide,
but the wounds did not bleed. Appellant and his wife put Maria's body in the trunk
of their car and dumped her body in a ditch.

 It took less than one hour for appellant to make this statement. When he was
done, appellant waited in the lobby. He was not arrested, nor was he told that he
could not leave. Sergeant Muniz told Detective White that appellant had confessed
to killing Maria. Detective White took a second recorded statement from appellant
later that evening. He also read appellant the warnings in article 38.22 of the Texas
Code of Criminal Procedure. See Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)
(Vernon 2005). Appellant acknowledged that he had received these warnings by
initialing next to each warning on a form. This statement also took appellant less than
one hour to make. When it was done, appellant went with other detectives to show
where he and his wife had disposed of Maria's body.

 Appellant returned to the police department around 1:00 a.m. He and his wife
were told that they were free to leave. Appellant, however, agreed to give a third
recorded statement. Detective White began reading the article 38.22 warnings to
appellant, but appellant finished them, quoting them to Detective White. After this
last statement, appellant left with his wife.

 That afternoon, appellant drove himself to the Sugar Land Police Department
and spoke with Detective White again. This conversation was also recorded. 
Appellant then went with Detective White to Maria's house to clarify some of the
details of the murder. Appellant demonstrated what had occurred. This walkthrough
of the crime scene was videotaped.

 On November 9, 2001, police officers took two dogs trained to detect the scent
of cadavers to the location where appellant said that he and his wife had dumped
Maria's body. The two cadaver dogs and their handlers worked the area
independently of one another so that they would not influence each other. Both dogs
alerted within five or six feet of one another, at the spot that appellant had indicated
he had placed the body. Although an excavation was performed, no remains were
found.

 On December 23, 2002, a grand jury indicted appellant for Maria's murder. 
The indictment read, 

 The duly organized Grand Jury of Fort Bend County, Texas, presents in
the District Court of Fort Bend County, Texas, that in Fort Bend County,
Texas, Frank Jose Trejos, hereafter styled the Defendant, heretofore on
or about June 11, 1994, did then and there

 

 Paragraph A

 intentionally and knowingly cause the death of an individual, MARIA
BARRIENTOS, by CHOKING HER.

 

 Paragraph B

 intentionally and knowingly cause the death of an individual, by A
MANNER AND MEANS UNKNOWN TO THE GRAND JURY.


 Appellant was arrested on December 30, 2002.

 On the day of trial, the venire was seated in the courtroom. The trial court 
asked the prospective jurors various questions. Each question was followed by
silence in response. The trial court asked if anyone knew appellant, and one member
of the venire raised his hand in response to the question. Immediately before the
State began its voir dire, the State requested a jury shuffle. Appellant's counsel
objected that the request was untimely because the trial court had already asked many
voir dire questions that were of the type likely to be helpful to the parties. The trial
court overruled the objection and granted the State's request for a jury shuffle.

 After the completion of voir dire, appellant moved to strike paragraph B of the
indictment, alleging that it was void because the second manner and means paragraph
did not include the complainant's name, Maria Barrientos. The State then verbally
requested that the indictment be amended to add Maria's name. Over appellant's
objection, the trial court allowed the amendment by handwriting "Maria Barrientos"
into paragraph B of the indictment.

Jury Shuffle

 In his first issue, appellant asserts that the trial court erred by allowing a shuffle
of the venire "after voir dire had effectively commenced." Under article 35.11 of the
Texas Code of Criminal Procedure, a party is entitled, upon timely demand, to have
the jury panel for the case shuffled. Tex. Code Crim. Proc. Ann. art. 35.11 (Vernon
2006). A shuffle has the effect of randomly reordering the names of prospective
jurors on the jury list. Montez v. State, 975 S.W.2d 370, 371 (Tex. App.--Dallas
1998, no pet.). A motion to shuffle is untimely if presented after voir dire has
commenced. Davis v. State, 782 S.W.2d 211, 214 (Tex. Crim. App. 1989). 

 Determination of when voir dire has commenced depends on whether the trial
is a capital trial in which the State is seeking the death penalty or a non-capital trial. (5) 
In a non-capital case, as here, a motion to shuffle is timely as long as the motion is
made before the State actually starts questioning the jurors in its portion of the voir
dire. DeLeon v. State, 731 S.W.2d 948, 949 (Tex. Crim. App. 1987); Williams v.
State, 719 S.W.2d 573, 577 (Tex. Crim. App. 1986). Regardless of the length or
detail of the trial court's questions to the venire panel in a non-capital case, the
bright-line rule is that the motion to shuffle the venire is timely when it is made
before the State begins questioning the potential jurors. See Williams, 719 S.W.2d
at 577 (holding motion to shuffle venire timely although for forty minutes, "the trial
judge introduced herself and made introductory remarks, identified the attorneys,
pointed out the appellant and his co-defendant, Raymond Jackson, discussed the
division of offenses into felonies and misdemeanors, gave examples of felonies of the
first, second and third degree and the applicable penalties, discussed capital murder
and its penalties and the high fines now available in cases of 'drug trafficking,' read
the instant indictment to the panel, told them the offense was formerly known as
aggravated rape, discussed jury strikes, the order of trial, the charge, jury
deliberations, verdicts, and referred to certain principles as presumption of innocence,
burden of proof, reasonable doubt, etc.").

 The State's motion to shuffle was timely in this non-capital case because it was
made before the State began its voir dire. See DeLeon, 731 S.W.2d at 949; Williams,
719 S.W.2d at 577. We hold that the trial court did not err by granting the State's
motion to shuffle the jury panel.

 We overrule appellant's first issue.

Amendment of Indictment

 In his second issue, appellant challenges the trial court's grant of the State's
motion to amend the indictment on the day of trial. Specifically, appellant contends
that, because the original indictment failed to include the complainant's name in the
second paragraph of the indictment, the second paragraph was void. Appellant also
asserts that allowing the State to amend the indictment on the day of trial had a
substantial and injurious effect that harmed him. The State contends that appellant
waived his right to challenge the indictment by not filing a pre-trial motion attacking
the indictment and, in the alternative, that if the amendment was error, it was
harmless.


A. Indictment Not Void

 On the day of trial, appellant objected that the indictment was void because it
did not include Maria's name in the second paragraph. "An indictment is a written
instrument presented to a court by a grand jury that charges a person with the
commission of an offense." Duron v. State, 915 S.W.2d 920, 921 (Tex.
App.--Houston [1st Dist.] 1996) (citing Tex. Const. Art. V, § 12(b)), aff'd, 956
S.W.2d 547 (Tex. Crim. App. 1997). However, the Court of Criminal Appeals has
recognized that "[s]ome defects . . . render the instrument a non-indictment." Duron
v. State, 956 S.W.2d 547, 550 (Tex. Crim. App. 1997) (citing Cook v. State, 902
S.W.2d 471, 478 (Tex. Crim. App. 1995)) (explaining that "those defects [are] of the
type that would make it impossible for the defendant to know with what offense he
had been charged."). In Duron, the court held that "a written instrument is an
indictment or information under the Constitution if it accuses someone of a crime
with enough clarity and specificity to identify the penal statute under which the State
intends to prosecute, even if the instrument is otherwise defective." Id. at 550-51.

 The pertinent statute here is the charge of murder in the Texas Penal Code. In
Texas, a person commits the offense of murder if he "intentionally or knowingly
causes the death of an individual." Tex. Pen. Code Ann. § 19.02(b)(1). The
complainant's name is not a statutory element of the criminal offense. Fuller v.
State, 73 S.W.3d 250, 253 (Tex. Crim. App. 2002) (holding that "[s]tate law does not
define the victim's name as a substantive element of the offense by, for example,
defining the offense as 'injury to an elderly individual named Olen M. Fuller.'");
Rodriguez v. State, 137 S.W.3d 758, 761 (Tex. App.--Houston [1st Dist.] 2004, no
pet.) (holding that "[s]tate law does not define the victim's name as a substantive
element of the offense by, for example, defining the offense as 'endangerment of a
child under 15 named Alexander Rodriguez.'"). The second paragraph of the
indictment, which states that appellant "intentionally and knowingly cause[d] the
death of an individual by a manner and means unknown to the grand jury" includes
all of the elements of the offense, and thus the failure to include Maria's name does
not make it void. See Tex. Pen. Code Ann. § 19.02(b)(1); Fuller, 73 S.W.3d at 253;
Rodriguez, 137 S.W.3d at 761.

B. Waiver by Appellant

 The State contends that we should hold that appellant waived his right to
challenge the indictment because he failed to object to the indictment prior to trial. 
See Duron, 915 S.W.2d at 922; Tex. Code Crim. Proc. Ann. art. 1.14(b) (Vernon
2005). In Duron, this Court stated that "all defects of form and substance [in an
indictment] are waived if the defendant does not object before the date on which the
trial begins." Id. The issue here is not whether appellant properly challenged the
indictment. The issue is whether the trial court properly amended the indictment on
the day of trial. We conclude that appellant did not waive his right to challenge the
State's amendment of the indictment on the day of trial.

C. Amendment of Indictment

 After appellant objected that the indictment was void due to its failure to name
Maria in the second paragraph, the State requested that the court amend the second
paragraph of the indictment to add Maria's name. Appellant objected and the trial
court overruled appellant's objection to the amendment. According to the Code of
Criminal Procedure, a motion to amend the indictment made on the day of trial, as
here, can only be granted "if the defendant does not object." See Tex. Code Crim.
Proc. Ann. art. 28.10(b) (Vernon 2006). (6) Because appellant objected to the State's
motion to amend the indictment on the day of trial, it was error for the trial court to
grant the amendment. See id. We must determine whether the trial court's erroneous
ruling under article 28.10 of the Code of Criminal Procedure is harmless error under
Rule 44.2(b) of the Texas Rules of Appellate Procedure. See Wright v. State, 28
S.W.3d 526, 531-32 (Tex. Crim. App. 2000); Flores v. State, 139 S.W.3d 61, 65-66
(Tex. App.--Texarkana 2004, pet. ref'd); Valenti v. State, 49 S.W.3d 594, 598 (Tex.
App.--Fort Worth 2001, no pet.). 

 Under Rule 44.2(b), we are required to disregard errors, defects, irregularities,
or variances that do not affect the accused's substantial rights. Tex. R. App. P.
44.2(b). An error affects a substantial right "when the error had a substantial and
injurious effect or influence in determining the jury's verdict." King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997). If looking at the record as a whole, it
appears the error "did not influence the jury, or had but a slight effect," we must
consider the error harmless and allow the conviction to stand. Johnson v. State, 967
S.W.2d 410, 417 (Tex. Crim. App. 1998). To determine whether the trial court's
error affected a substantial right, we examine the possible outcomes had the
indictment not been erroneously amended. The critical inquiry requires consideration
of whether the indictment, as written, informed the defendant of the charge against
him sufficiently to allow him to prepare an adequate defense at trial, and whether
prosecution under the original indictment would subject the defendant to the risk of
being prosecuted later for the same crime. Gollihar v. State, 46 S.W.3d 243, 248
(Tex. Crim. App. 2001) (quoting United States v. Sprick, 233 F.3d 845, 853 (5th Cir.
2000)). 

 Appellant asserts that his substantial rights were prejudiced because the trial
court allowed the State to correct a void indictment denying him the right to proceed
to trial on the indictment returned by a grand jury. As we note above, the indictment
here was not void. See Tex. Pen. Code Ann. § 19.02(b)(1); Fuller, 73 S.W.3d at
253; Rodriguez, 137 S.W.3d at 761. The indictment originally charged that appellant
"intentionally and knowingly cause[d] the death of an individual, by a manner and
means unknown to the grand jury." The amendment added the complainant's name,
Maria Barrientos, after the word "individual" to state that appellant "intentionally and
knowingly cause[d] the death of an individual, Maria Barrientos, by a manner and
means unknown to the grand jury." The amended indictment that includes Maria's
name charges the same statutory offense as was charged in the original indictment. 
See Tex. Pen. Code Ann. § 19.02(b)(1); see Flowers v. State, 815 S.W.2d 724,
728-29 (Tex. Crim. App. 2001). Further, paragraph A of the indictment charged
appellant with the same crime, murder, and specifically named Maria. Paragraph A
states that appellant did "intentionally and knowingly cause the death of an
individual, MARIA BARRIENTOS, by CHOKING HER." The second paragraph,
paragraph B, which is the subject of appellant's complaint here, followed the first
paragraph, paragraph A, by also charging that appellant did "intentionally and
knowingly cause the death of an individual." We cannot conclude that appellant's
"substantial rights" were prejudiced by the failure to specifically name Maria in the
second paragraph when the first paragraph of the same indictment charges the same
offense with different manner and means of committing the offense. We note further
that the trial court offered to give appellant an additional ten days to prepare for trial,
but appellant opted not to accept the court's offer. See Tex. Code Crim. Proc. Ann.
art. 28.10(a). We cannot conclude that appellant's substantial rights were prejudiced
under these circumstances. 

 We hold that the trial court erred by allowing the State to amend the indictment
on the day of trial, but that the error was harmless because the first paragraph of the
indictment charged the same offense with a different manner and means against the
same person.

 We overrule appellant's second issue. 

The Audio-Taped Statement

 In his third issue, appellant contends that the trial court erred by admitting the
audio-taped statement that he gave to Sergeant Muniz, which he claims was a result
of custodial interrogation and was inadmissible because it failed to comply with
article 38.22 of the Code of Criminal Procedure. 


A. Motion to Suppress Standard of Review

 In reviewing the trial court's ruling on a motion to suppress evidence, we apply
a bifurcated standard of review. Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim.
App. 2000); Blake v. State, 125 S.W.3d 717, 722 (Tex. App.--Houston [1st Dist.]
2003, no pet.). We give almost total deference to the trial court's determination of
historical facts that depend on credibility, while we conduct a de novo review of the
trial court's application of the law to those facts. Carmouche, 10 S.W.3d at 327. If,
after a hearing on a motion to suppress, the trial court does not file findings of fact,
as here, we view the evidence in the light most favorable to the trial court's
determination and we assume that the trial court made implicit findings of fact in
support of its determination if those findings are supported by the record. State v.
Gray, 158 S.W.3d 465, 467 (Tex. Crim. App. 2005) (quoting State v. Ross, 32 S.W.3d
853, 855-56 (Tex. Crim. App. 2000)). We will uphold the determination by the trial
court if it is correct on any theory of law applicable to the case. Id.

B. Article 38.22

 The Code of Criminal Procedure provides requirements that must be followed
for a custodial statement to be admitted in evidence at trial. See Tex. Code Crim.
Proc. Ann. art. 38.22, § 3(a); Woods v. State, 152 S.W.3d 105, 116 (Tex. Crim. App.
2004). However, the restrictions in the Code of Criminal Procedure apply only to
statements "made as a result of custodial interrogation." See Tex. Code Crim. Proc.
Ann. art. 38.22, § 3(a); Woods, 152 S.W.3d at 116. (7) Thus, appellant's statement is
admissible even if it does not comply with the conditions in the Code of Criminal
Procedure if appellant was not in custody when it was made. See Tex. Code Crim.
Proc. Ann. art. 38.22, § 3(a); Woods, 152 S.W.3d at 116.

 The central dispute here concerns whether appellant was in custody when he
made the audio taped statement. "A person is in 'custody' only if, under the
circumstances, a reasonable person would believe that his freedom of movement was
restrained to the degree associated with a formal arrest." Dowthitt v. State, 931
S.W.2d 244, 254 (Tex. Crim. App. 1996). The reasonable person standard
presupposes an innocent person. Id. The subjective intent of law enforcement
officials to arrest is irrelevant, unless that intent is somehow communicated or
otherwise manifested to the suspect. Id. 

 "The determination of custody must be made on an ad hoc basis, after
considering all of the (objective) circumstances." Id. at 255. Stationhouse
questioning does not, in itself, constitute custody. Id. However, the mere fact that
an interrogation begins as noncustodial does not prevent custody from arising later;
police conduct during the encounter may cause a consensual inquiry to escalate into
a custodial interrogation. Id.

 There are four general situations that may constitute custody: (1) when the
suspect is physically deprived of his freedom of action in any significant way, (2)
when a law enforcement officer tells the suspect that he cannot leave, (3) when law
enforcement officers create a situation that would lead a reasonable person to believe
that his freedom of movement has been significantly restricted, and (4) when there
is probable cause to arrest and law enforcement officers do not tell the suspect that
he is free to leave. Id. Concerning the first through third situations, the restriction
upon freedom of movement must amount to the degree associated with an arrest as
opposed to an investigative detention. Id. The first through the third situations are
not presented here. The sole question before us is whether, during the encounter with
appellant when he gave his statement at the police station, probable cause to arrest
appellant developed during the course of the encounter, which is the fourth situation. 
Id.

 Concerning the fourth situation, the officers' knowledge of probable cause
must be manifested to the suspect; such manifestation could occur if information
substantiating probable cause is related by the officers to the suspect or by the suspect
to the officers. Id. Moreover, the fourth situation does not automatically establish
custody. Id. Rather, custody is established in the fourth situation if the manifestation
of probable cause, combined with other circumstances, would lead a reasonable
person to believe that he is under restraint to the degree associated with an arrest. Id. 
In Dowthitt, the Court of Criminal Appeals held that "custody" began when Dowthitt
admitted to his presence during the murders because "a reasonable person would have
realized the incriminating nature of the admission," and other factors were present
that "involv[ed] the exercise of police control" over him. Id. at 257. These other
factors included a lengthy interrogation lasting over 12 hours from the time he first
appeared at the police station to the time he made the incriminating statement, police
officers accompanying him to the restroom, and police officers ignoring his requests
to see his wife. Id. 

 The United States Supreme Court addressed the question of "custody" in the
context of a stationhouse interrogation in Beheler and Mathiason. California v.
Beheler, 463 U.S. 1121, 1124-25, 103 S. Ct. 3517, 3519-20 (1983); Oregon v.
Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977). In Beheler, the suspect
voluntarily accompanied the police to the station, talked for less than 30 minutes, and
was permitted to return home. 463 U.S. at 1122, 103 S. Ct. at 3518. The Court held
that this interview was not custodial. Id. at 1125, 103 S. Ct. at 3520. In Mathiason,
the suspect came voluntarily to the police station, was immediately informed that he
was not under arrest, participated in a 30-minute interview, and left the police station
without hindrance. 429 U.S. at 493-94, 97 S. Ct. at 713. The Court likewise held
that interview to be non-custodial. Id. at 495, 97 S. Ct. at 714; see also Meek v. State,
790 S.W.2d 618, 622 (Tex. Crim. App. 1990) (finding no custody when suspect came
to station voluntarily at time of his own choosing, was allowed to step outside
building and go unaccompanied to his car during interviews, and "a few hours" later
was allowed to leave unhindered after statements were completed); Turner v. State,
685 S.W.2d 38, 41-43 (Tex. Crim. App. 1985) (finding no custody when witness who
was not suspect was contacted by police, voluntarily went to police station to make
a statement, and was immediately read warnings when he made statement that caused
police to suspect him); Dancy v. State, 728 S.W.2d 772, 777-79 (Tex. Crim. App.
1987) (finding no custody when suspect voluntarily came with police to station,
voluntarily answered questions, gave hair samples, allowed police to take his shoes
to run print comparisons, and was arrested at conclusion of 38-minute interview). 

 Although a statement made by a person is sufficient to establish probable
cause, the statement is not custodial if the court determines based on other factors that
the person was not under arrest. Garcia v. State, 106 S.W.3d 854, 858-59 (Tex.
App.--Houston [1st Dist.] 2003, pet. ref'd). Garcia, the defendant, was not in
custody when he voluntarily went to the police department, and after he was told that
he could leave, he voluntarily gave a videotaped statement. Id. at 858. Garcia made
an admission establishing probable cause during his statement, which took 30
minutes. Id. at 858-598. We held that, although his statement was sufficient to
establish probable cause, other factors showed that Garcia was not under arrest. Id. 
Only two officers were with Garcia, and neither was armed. Id. at 858. After the
statement, Garcia was taken to a visitor's room where he was left, unguarded, with
his girlfriend. Id. at 859. Nothing prevented Garcia from simply leaving the police
department. Id. We held that "a reasonable person in [Garcia's] position would not
believe that he was restrained to the degree associated with a formal arrest." Id.

 At the hearing on the motion to suppress, Sergeant Muniz, Detective White,
and appellant testified. The testimony of Sergeant Muniz and Detective White shows
that on the afternoon of November 7, 2001, Sergeant Muniz, Detective White, and
other officers went to appellant's apartment. When the officers arrived at the
apartment, they found small children there, unaccompanied by adults. After a short
while, appellant arrived at the apartment. Detective White, who had been assigned
to Maria's case since 1994, knew appellant and introduced Sergeant Muniz. Sergeant
Muniz acknowledged that he "probably could have told" appellant something to the
effect that the children could be taken away if they were being left abandoned. 
However, Sergeant Muniz denied making any threat to call CPS about the unattended
children at the apartment or making any threats concerning appellant's children. 

 Sergeant Muniz was in plain clothes with his police identification displayed. 
Detective White told appellant that they would like to speak with him. Detective
White told appellant that they just wanted to talk to him about Maria's "missing
person case." Appellant agreed to go to the Sugar Land Police Department to give
an interview. Appellant's mother remained at the apartment with the children.

 Because he did not have a car to drive, appellant rode with Sergeant Muniz in
an unmarked pickup truck, where they made small talk on the way to the police
station. Appellant rode in the front seat of the truck, without any handcuffs. On the
drive to the police station, appellant's wife was called to let her know that appellant
was at the police station. She also agreed to come to the police station after work that
day to give a statement. 

 At around 5:00 p.m., they arrived at the Sugarland Police Department, which
was undergoing remodeling, and entered a small office in a portable building. 
Sergeant Muniz explained that when he began speaking with appellant, appellant was
not in custody and was free to leave. Only Sergeant Muniz and appellant were
present during the interview. Sergeant Muniz explained that he never threatened
appellant "with anything," did not make any promises to him, and that appellant
voluntarily agreed to give a statement. Sergeant Muniz read appellant the warnings
set out in article 38.22 of the Code of Criminal Procedure, even though Muniz
believed that was not required because appellant was not in custody. See Tex. Code
Crim. Proc. Ann. art. 38.22, § 3(a). Appellant waived his rights and agreed to talk
to the Sergeant, who interviewed appellant for about 15 or 20 minutes. Appellant
quickly admitted to being involved with Maria's death. Appellant told Sergeant
Muniz that he wanted to give a statement because he had "a premonition that Ms.
Barrientos' ghost came and visited him one night and said two men wanted to come
talk to him, and he wanted to get it off his chest, he wanted to come through with the
truth."

 After this, Sergeant Muniz began recording appellant's statement. The
recording began at 5:38 and ended at 5:58. On the tape, appellant acknowledged that
he had been read "Miranda warnings." When the interview finished, appellant asked
Sergeant Muniz if he was going to be arrested. Sergeant Muniz told him "not yet, not
at that time." After the taped interview, appellant sat in the lobby of the building that
had the front door wide open, where he sat by himself, before his wife came to the
station in her car. Sergeant Muniz said that appellant did not ask for an attorney. 
Sergeant Muniz did offer to get appellant some cigarettes.

 Appellant's testimony was considerably different from the police officers'
testimony. Appellant said that Sergeant Muniz told him "you have to come with me"
to the Police Department. Appellant claims that Sergeant Muniz told him that if he
did not come to the Department, he could lose his kids because Sergeant Muniz
would call Child Protective Services to tell them that appellant had abandoned his
children. Appellant testified that he asked Sergeant Muniz if he needed a lawyer, but
was told that he did not need one because "[w]e're just going to be chatting." 
Claiming that he did not understand the rights Sergeant Muniz read to him, appellant 
related that he spoke to the police officers due to his worry that he might lose his
children.

 After the hearing, the trial court ruled that the statements to Sergeant Muniz
and Detective White were admissible because the "statements were not the result of
custodial interrogation." The trial court did not file findings of fact regarding its
rulings. Appellant contends that he was in custody at the point that he admitted to
Sergeant Muniz his role in Maria's death, and that Sergeant Muniz considered
appellant a suspect and did not tell appellant that he was free to leave. We conclude
that appellant's statements made during the initial interview by Sergeant Muniz that
acknowledged his involvement in the murder of Maria provided sufficient probable
cause to arrest him. See Dowthitt, 931 S.W.2d at 257. However, we conclude that
the other circumstances present, when viewed in a light most favorable to the trial
court's ruling, are sufficient to show that he was not in custody. Although appellant
rode with a police officer to the station, the record shows that the police car was an
unmarked vehicle and that appellant chose to ride with the officer because he did not
have a car. The record also shows that although appellant's rights were not read to
him while the audio tape was recording his statement, appellant acknowledged that
he had previously been read his "Miranda warnings" and Sergeant Muniz testified
that appellant waived his rights. The record also shows that appellant's interview was
short in length, lasting only 15 or 20 minutes, from the time he got to the police
station to the time he made the admissions about his involvement in the murder.
Additionally, appellant was only interviewed by one police officer, who was in plain
clothes, and in an office-like setting. Further, appellant was not threatened in any
way, was not promised anything, and voluntarily made the statement, according to the
Sergeant. Appellant was told that he was not under arrest after he made the statement
to Sergeant Muniz, and he sat in a lobby with an open front door. 

 The facts here are unlike the lengthy 12-hour period involved in Dowthitt,
which included other circumstances that showed that Dowthitt was in custody. See
Dowthitt, 931 S.W.2d at 256. Instead, the situation here is more like Garcia, which
held that Garcia was not in custody, despite his statements that gave the officers
probable cause to arrest him. See Garcia, 106 S.W.3d at 858-59. We hold that
although appellant's statements were sufficient to establish probable cause to arrest
him, the other circumstances present would not "lead a reasonable person to believe
that he is under restraint to the degree associated with an arrest." See Dowthitt, 931
S.W.2d at 254; Garcia, 106 S.W.3d at 859. We further hold that because the
statement was not made while appellant was in custody, it did not need to comply
with article 38.22 of the Code of Criminal Procedure, and thus the trial court did not
err by admitting the statement. See Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a);
Woods, 152 S.W.3d at 116.

 We overrule appellant's third issue.

Subsequent Statements to Police Officers

 In his fourth issue, appellant asserts that his subsequent statements made after
the audio-taped statement to Sergeant Muniz were inadmissible as "fruits of the
poisonous tree" and should not have been admitted. 

 After Sergeant Muniz recorded appellant's statement, he told Detective White
that appellant had confessed. Within a short time, perhaps five minutes, Detective
White sat down with appellant, interviewing him and preparing a written statement. 
This interview took from 30 minutes to an hour. At the end of this time, appellant
signed the written statement, which had been typed by Detective White.

 Immediately after signing the statement, appellant left with other officers to
show them where he and his wife had dumped Maria's body. He was gone for
approximately four hours. He arrived back at the police department around 1:00 a.m. 
Appellant gave an additional statement to Detective White that was recorded with an
audio tape.

 After the second statement, Detective White asked appellant to return late in
the morning or in the early afternoon of that same day, November 8, 2001. Appellant
voluntarily returned and gave a third statement to Detective White beginning at 1:06
p.m. This third statement was also recorded by audio tape.

 An appellant waives a ground for appeal if that point is not raised before the
trial court. See Martinez v. State, 17 S.W.3d 677, 682-83 (Tex. Crim. App. 2000)
(citing Tex. R. App. P. 33.1). To preserve a complaint for appeal, the objection at trial
must conform with the grounds asserted in the appeal. See id.; Wade v. State, 164
S.W.3d 788, 792-93 (Tex. App.--Houston [14th Dist.] 2005, no pet).

 Here, appellant's written motion to suppress and his arguments to the trial court
concerning the motion to suppress are premised on the contention that he was not
properly informed of his rights before the statements were made and that he was in
custody when the statements were made. On appeal, appellant contends for the first
time that the statements to Detective White "were 'the product of the fruits of the
poisonous tree' of SGT. MUNIZ'S prior acts." Appellant urges this Court to apply
the four-factor "attenuation of the taint" analysis of Brown v. Illinois, 422 U.S. 590,
95 S. Ct. 2254 (1975). Because this basis for the objection to the three statements
given to Detective White was not raised before the trial court, appellant has not
preserved this complaint for appeal. See Martinez, 17 S.W.3d at 683. We hold that
appellant waived his complaint about the subsequent statements given to Detective
White. See Williams, 17 S.W.3d at 682-83; Wade, 264 S.W.3d at 792-93. (8)

 We overrule appellant's fourth issue.

Reliability of Expert Testimony Regarding Cadaver Dogs

 In his fifth issue, appellant asserts that the trial court erred by admitting
testimony that the cadaver dogs alerted on the scent of human remains because the
evidence was not shown to be reliable. 

A. Standard of Review and Rules for Determination of Reliability


 A trial court's decision to admit or exclude scientific testimony is reviewed for
an abuse of discretion and a reviewing court will uphold the decision if it is within
the zone of reasonable disagreement. Sexton v. State, 93 S.W.3d 96, 99 (Tex. Crim.
App. 2002). A trial court abuses its discretion when it acts without reference to any
guiding rules or principles. Montgomery v. State, 810 S.W.2d 372, 380 (Tex. Crim.
App. 1990).

 Rule 702 of the Texas Rules of Evidence allows a qualified expert to provide
evidence about a subject that requires specialized knowledge. Tex. R. Evid. 702. In
assessing admissibility under Rule 702, the trial court must "determine whether the
testimony is sufficiently reliable and relevant to help the jury in reaching accurate
results." Kelly v. State, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). In Kelly, the
Court of Criminal Appeals set forth a three-prong reliability test and identified seven
non-exclusive factors for courts to consider in assessing reliability of scientific
evidence. (9) Id. at 573; see also Winston v. State, 78 S.W.3d 522, 526 (Tex. App.--
Houston [14th Dist.] 2002, pet. ref'd). Appellant suggests that the Kelly factors
should be applied here. 

 However, when the expert evidence concerns "areas of soft science and
non-traditional sources of expert testimony," the Court of Criminal Appeals has
adopted an "appropriately tailored translation of the Kelly test." State v. Medrano,
127 S.W.3d 781, 785 (Tex. Crim. App. 2004) (citing Nenno v. State, 970 S.W.2d 549,
561(Tex. Crim. App. 1998), overruled on other grounds by State v. Terrazas, 4
S.W.3d 720 (Tex. Crim. App. 1999)). In Nenno, the Court stated that when
addressing fields that are based upon experience or training as opposed to scientific
methods, the appropriate questions for assessing reliability are (1) whether the field
of expertise is a legitimate one, (2) whether the subject matter of the expert's
testimony is within the scope of the field, and (3) whether the expert's testimony
properly relies upon or utilizes the principles involved in the field. 970 S.W.2d at
561. We agree with the Fourteenth Court of Appeals's determination that the
reliability of expert testimony that describes a dog's alert to a scent is determined by
using the Nenno criteria. See Winston, 78 S.W.3d at 526 ("Since interpretation of a
dog's reaction to a scent lineup is based upon training and experience, and not
scientific method, we apply the less rigorous Nenno test in this case."). (10)


 B. Reliance Upon or Utilization of Principles in the Field


 Here, appellant has not challenged the first two prongs of Nenno that ask
whether the field of expertise is a legitimate one and whether the subject matter of the
expert's testimony is within the scope of that field. See Nenno, 970 S.W.2d at 561. 
Appellant's challenge concerns only the third prong that asks whether the expert's
testimony properly relies upon or utilizes the principles involved in the field of
expertise. See id. 

 The Court of Criminal Appeals has not established criteria for determining
whether the expert's testimony concerning cadaver dogs properly relies upon or
utilizes the principles involved in the field. We, however, have applied three factors
for determining reliability of expert testimony concerning dogs that alert to the scent
of humans. Risher v. State, No. 01-05-00960-CR, 2006 WL 3518145, at *2 (Tex.
App.--Houston [1st Dist.] 2006, pet. filed ) (applying three factors to determine
whether third prong of Nenno is met in human-scent lineup evidence of convicted
drug dealer); see also Winston, 78 S.W.3d at 527 (analyzing third prong of Nenno
utilizing three-factor approach to determine admissibility of human-scent lineup
evidence in burglary case). As here, the dogs in Risher and Winston alerted to human
scents. See Risher, 2006 WL 3518145, at *3; Winston, 78 S.W.3d at 527. However,
the dog in Risher involved a human-scent lineup and the dog in Winston identified
a burglary suspect based on human-scent left at the scene. Although Risher and
Winston did not involve cadaver dogs, we conclude that the factors used by our Court
in Risher and by the Fourteenth Court of Appeals in Winston are equally applicable
to cadaver dogs. See Risher, 2006 WL 3518145, at *2; Winston, 78 S.W.3d at 527. 
 To determine whether the testimony describing the alerts by the cadaver dogs
meets the third prong in Nenno, we must examine the (1) the qualifications of the
particular trainer, (2) the qualifications of the particular dog, and (3) the objectivity
of the particular cadaver search. See Risher, 2006 WL 3518145, at *2 (recognizing
foundation for dog's reliability for human-scent lineup by examining qualifications
of particular trainer; qualifications of particular dog; and objectivity of particular
lineup).

 1. Qualifications of Trainers 


 The two dogs, Missy and Chloe, each had trainers, and, in addition, Deputy
Pickett testified about his role in training these dogs. We address each of their
qualifications. See Risher, 2006 WL 3518145, at *2-3. 

 Missy, the dog that made the initial alert in this case was trained by Ja' Na
Bickel, the owner, and Deputy Pikett, a trainer. Bickel testified that after she retired
from a previous job she founded "Special Canines," an organization that assists law
enforcement agencies and families to find bodily remains. She also testified that she
has conducted cadaver searches since 1994. Bickel has two dogs that she trains in
cadaver searching, Missy and a young Catahoula. Bickel has received canine training
from Deputy Pikett as well as other experts at seminars.

 Chloe is the dog that independently confirmed the scent initially detected by
Missy. Ann Spurlock, Chloe's owner and co-trainer, testified that her work with dogs
began as a professional dog obedience trainer. Spurlock initially became involved
in searches as an assistant to other dog handlers. She started training Chloe in
tracking and trailing, but moved into cadaver work when Chloe showed a natural
propensity to want to find and search in a more free-form manner. 

 Deputy Pikett, who has a Bachelor of Science degree and a Master of Science
degree in Chemistry, both from the University of Southern Alabama, trained Missy
and Chloe, the dogs used in this case. He began his canine training in 1989 by "old
timers" with forty to fifty years experience. Pikett has attended over 176 hours of dog
training seminars including some hands on training conducted by experts in the field. 
Deputy Pikett's canine work began with trailing people and progressed to cadaver
work. He has written articles for the National Bloodhound Bulletin and the South
Central Bloodhound Newspaper and has lectured for the Sugar Land Police
Department as well as for the FBI on several occasions. Deputy Pikett has trained
dogs for the cities of Galveston, Houston, Dallas, Bellaire, and the Texas Parks and
Wildlife Department. In 1997, the FBI approached Deputy Pikett to search for
missing people. Deputy Pikett testified that experts in the community have observed
his dog training technique and expressed approval. Additionally, Deputy Pikett has
testified as an expert in canine training in other cases and his testimony has never
been excluded. See e.g. Winston, 78 S.W.3d at 527 (holding that testimony from
Deputy Pikett describing dog's alert in scent lineup admissible). We conclude that
the trainers were qualified to handle Missy and Chloe, the cadaver dogs used in this
case. 

2. Qualifications of Dogs

 We must next examine the qualifications of the dogs, Missy and Chloe. In
determining whether a dog used in a scent lineup was qualified, we have applied five
factors. Risher, 2006 WL 3518145, at *3 (citing Winston, 78 S.W.3d at 527-28). In
Risher, we held that a scent-lineup dog is qualified if "it (1) is of a breed
characterized by acuteness of scent and power of discrimination, (2) has been trained
to discriminate between human beings by their scent, (3) has been found by
experience to be reliable, (4) was given a scent known to be that of the alleged
participant of the crime, and (5) was given the scent within the period of its
efficiency." Id. (applying five factors to assess reliability of dog in human scent
lineup). The Fourteenth Court of Appeals applied these same five factors in Winston
to determine the reliability of a dog that tracked a burglary suspect based on human
scent left at the crime scene. Winston, 78 S.W.3d at 527-28. We must determine
whether these five factors are equally applicable to searches by cadaver dogs. 

 Searches by cadaver dogs are different from searches by dogs for scents left by
live humans. Deputy Pikett testified that cadaver searching is a less rigorous skill
because it only requires the dog to be able to distinguish between human scents and
animal scents, and the dog need not further distinguish between individual humans. 
As we explain below, because the skills necessary for a cadaver dog differs from the
skills necessary for scent lineups or the tracking of suspects, we conclude that only
some of the five factors in Risher apply to searches by cadaver dogs. See Risher,
2006 WL 3518145, at *4.

 a. Breed Characterized by Acuteness of Scent

 Deputy Pikett testified that all dogs have a more acute sense of smell than
humans and that bloodhounds have an olfactory sense that is 26 times that of a
human. Deputy Pikett explained that because a cadaver dog need not distinguish
between the scents of different individuals and need only distinguish between the
scent of human and animal remains, a breed such as a bloodhound that is traditionally
known for its acuteness of scent is not necessary to use as a cadaver dog. Deputy
Pikett further explained that a bloodhound is typically not a good cadaver search dog
because bloodhounds are "not great obedience dogs" and typically must be worked
on a lead, or leash. Deputy Pikett testified that in a large area search, a dog that can
work off-lead is more credible because it is free to make an independent find, without
the possibility that its handler will lead it to a particular area. Deputy Pikett said that
other breeds, "such as Rottweilers mixed-breeds, Lab[radors] and so forth" can
perform as cadaver dogs. We conclude that the breed of dog characterized by
acuteness of scent is not determinative of a cadaver dog's qualification. However,
we slightly modify this factor to examine whether the dog type or breed typically
works well off-lead.


 b. Trained to Discriminate Between Human Beings by Scent

 Cadaver dogs are not trained to discriminate between human beings based on
scent because the identity of the body being searched for is generally not in dispute. 
Deputy Pikett explained that the important distinction for a cadaver dog to master is
between human remains and animal remains. The training begins with fairly fresh
cadaver scent in a relatively easy location. The dogs progress to older body scents
and then to the introduction of foreign scent distractions such as deer, horse, or cow
bones. We conclude that this requirement must be adapted slightly for determination
of the reliability of cadaver dogs by examining whether the dog has been trained to
discriminate between human cadaver scents and animal scents.

 c. Found by Experience to Be Reliable

 Proven reliability must be a qualifying characteristic of a cadaver dog, just like
the need for proven reliability of dogs used in scent-lineups and the tracking of
suspects. Deputy Pikett testified that a dog that cannot pass the training tests--for
example, by failing to distinguish human and animal remains--will be retired from
cadaver search work. To ensure that the dog can distinguish human and animal
scents, Deputy Pikett explained that a dog in training must first prove that it can
actually find a human scent, and then the training progresses to older scents, followed
by the introduction of foreign scents. We therefore conclude that this factor is
applicable to the qualifications and reliability of a cadaver dog.


 d. Given the Scent of the Participant of Crime

 As explained above, the use of a cadaver dog is not for identification of a
particular person by that person's scent. The cadaver dog searches only for the scent
of human remains and is not used to track or identify a particular person's scent. We
therefore conclude that this factor does not apply to the qualifications of a cadaver
dog.

 e. Given Scent Within the Period of Efficiency

 Unlike scent-lineups, cadaver searches are typically performed substantially
after the crime has been committed. Deputy Pikett testified that a dog trained to find
human remains can detect the scent remaining in the soil from a decomposing body,
even though physical remains are no longer present. Likewise, Deputy Pikett testified
that when a body has lain on the ground and decomposed, a dog can pick up the smell
of the water, the blood, and the disintegrating organs that have seeped into the soil. 
We therefore conclude that this element is not relevant in the context of cadaver
searching because the immediacy of the search is not indicative of the efficiency of
the scent.

 Having examined the five factors in Risher and Winston, we have determined
that those factors must be adapted slightly to meet the unique function of a cadaver
dog--to detect deteriorating human remains. We conclude that the factors we must
examine to determine a cadaver dog's qualifications and reliability are whether the
dog (1) is a breed or type that typically works well off-lead, (2) has been trained to
discriminate between human scents and animal scents, and (3) has been found by
experience to be reliable. See Risher, 2006 WL 3518145, at *4. These factors are not
exclusive. Other factors may be considered in an appropriate case. 

 f. Application of the Adapted Factors

 We apply the three factors described above to determine whether Missy and
Chloe were qualified cadaver dogs. The first factor is whether the type or breed of
dog works well off-lead. Missy is a mixed-breed dog, a Sharpei-shepherd mix. 
Chloe is a Rottweiler. Deputy Pikett testified that mixed-breed dogs and Rottweilers
are capable of performing as cadaver dogs, and that cadaver dogs are dogs that work
well off-lead. Although his testimony does not directly show that these dogs work
well off-lead, his testimony reasonably supports the inference. Thus, the first factor
weighs slightly in favor of the implied finding that Missy and Chloe were qualified
and reliable.

 The second factor concerns the training of the dog to distinguish between
human cadaver scents and animal scents. Before the search in 2001, Bickel and her
dog Missy had been to at least 10 different training seminars in addition to training
several times a week. Deputy Pikett testified that he had trained extensively with
Missy and she is a very good dog. In 2000, Missy was certified by two local
organizations and two national organizations, including the North American Search
Dog Network and the Lone Star Search and Rescue Dog Association.

 Spurlock testified that she and Chloe, the confirmatory dog, had received
training at various seminars from dog trainers and from law enforcement personnel
and that Chloe exhibited a meticulous attitude towards cadaver work. In November
2001, Chloe had received extensive training for one and one-half years, was certified
within the volunteer group of which she and Spurlock were a part, but was not
certified by any national organization. The local certifications were done by an
outside evaluator that utilized the same standards as the national organizations. Only
dogs who meet the standards will be used for a cadaver search. The State's witnesses
established that these cadaver dogs had received training and were certified to be used
in searches. The second factor weighs in favor of the implied finding that the dogs
were qualified to conduct the cadaver search. 

 The third factor is whether the dog has been shown to be reliable in its prior
experiences searching for cadavers. Bickel testified that as of November 9, 2001,
Missy already had a good history of finding human remains. After receiving her
certification, Bickel testified that she had never known Missy to indicate a false
positive, such as alerting on animal remains. Spurlock testified that in Chloe's
training she performed very well when distractions such as animal bones or fluids
were put out in the field and was still able to find the human remains. Spurlock
testified that she had tested Chloe using many different scenarios such as various
fluid samples from the morgue and items buried as deep as five feet. Spurlock also
testified that she and Chloe had conducted "numerous searches for remains" and that
this case was the first time she had been called to court to testify about a cadaver
search. Spurlock testified that during her training and searches, Chloe had never
given an alert that was later proved false. Deputy Pikett similarly testified that based
upon his training and dealing with Missy and Chloe, they were reliable each time he
used them. The witnesses testified that a dog that could not consistently show its
reliability in training was not used for actual searches. The witnesses' testimony
established that Missy and Chloe had never falsely indicated human remains and that
Missy and Chloe could consistently distinguish human remains from other scents. 
The third factor weighs in favor of the implied finding that the dogs were qualified.

 The three factors, when applied to Missy and Chloe, support the trial court's
implied finding that the dogs were qualified to search for cadavers. We conclude that
the record supports the trial court's implied finding that the dogs were qualified to
conduct the search for the cadaver.

 3. Method of Search

 The third factor under the third prong of Nenno requires that we examine the
objectivity of the particular search, which here is the manner that the search for the
cadaver was conducted. See Risher, 2006 WL 3518145, at *4. Deputy Pikett
testified that he observed both dog and handler teams used in this case during their
searches for Maria's body on November 9, 2001. He stated that both handlers used
their dogs in the manner generally employed by cadaver dog teams. Bickel and
Spurlock also testified that their dogs followed the practices and procedures that are
generally used in searches by cadaver dogs. The two dogs worked independently of
one another, so that they would not influence each other. Bickel testified that Missy
performed a grid search on three areas on the property, but only alerted on one. 
Spurlock testified that there were no outside influences on Chloe's search that would
have caused her to alert in a designated area. According to Spurlock, Chloe was
simply positioned downwind on the property and instructed to start. Each dog
performed its search independently from the handlers, working off-lead. Finally, the
dogs alerted to the same location that appellant had indicated Maria's body had been
placed. We conclude that the record shows that the search for the cadaver was
conducted objectively, using practices and procedures that are generally used in
searches by cadaver dogs. 

 We hold that the proper foundation was established as required by the Nenno
test and that the trial court did not abuse its discretion in determining that the
evidence regarding the cadaver dogs was reliable and admissible. See Winston, 78
S.W.3d at 522.

 We overrule appellant's fifth issue. 

Whether Expert Testimony About Cadaver Dogs Is Unfairly Prejudicial 

 In his sixth issue, appellant asserts that the trial court erred by admitting
testimony that the cadaver dogs alerted on the scent of human remains because the
evidence was more prejudicial than probative under Rule 403 of the rules of evidence. 
See Tex. R. Evid. 403. Appellant asserts that the evidence has little probative value
because no human remains were found and, thus, the dogs could have been mistaken. 
Appellant further asserts that because Deputy Pikett, Bickel, and Spurlock all
admitted on cross-examination that even if the dogs alerted to the scent of human
remains, there were a "myriad of other explanations" for how the scent of remains got
to the location identified by the dogs. (11) 

 A trial court's decision to admit or exclude testimony is reviewed for an abuse
of discretion. See Sexton, 93 S.W.3d at 99. Rule 403 provides that relevant evidence
"may be excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury." Tex. R. Evid. 403. 
The Court of Criminal appeals has identified a non-exclusive list of factors to apply
in making a rule 403 analysis. Reese v. State, 33 S.W.3d 238, 240-41 (Tex. Crim.
App. 2000). These factors include, but are not limited to,

 (1) how probative the evidence is;


 (2) the potential of the evidence to impress the jury in an irrational
but indelible way;


 (3) the time the proponent needs to develop the evidence; and


 (4) the proponent's need for the evidence.


Id. A trial court's ruling on a rule 403 objection is reviewed for an abuse of
discretion. Id. at 241.

 Under the first factor, we note that the evidence of the cadaver dogs is
probative. Two dogs independently indicated that they detected the scent of human
remains in the same spot that appellant stated that he had dumped Maria's body. The
second factor requires that we examine the potential of the evidence to impress the
jury in an irrational but indelible way. The evidence from the cadaver dog's alert on
the scent of human remains at the location where appellant states that he dumped
Maria's body merely corroborates appellant's own statements. We cannot conclude
that the evidence describing the alerts by the dogs would impress the jury in an
irrational and indelible way. The third factor concerns the time that the proponent
needs to develop the evidence. The record does not clearly indicate the exact time
required by the State to present the testimony of Deputy Pikett, Bickel, and Spurlock
to the jury, however, it was less than half of one day of trial. (12) The fourth factor also
supports the trial court's ruling to admit the evidence. The State needed the evidence
to corroborate appellant's statements and to show that Maria was dead because her
body was never recovered. Thus, under the factors identified in Reese, we conclude
that the trial court did not abuse its discretion in finding that the dangers of unfair
prejudice, confusion of the issues, or misleading the jury did not "substantially
outweigh" the probative value of the evidence regarding the cadaver dogs.

 Appellant cites Wiley v. State, 74 S.W.3d 399 (Tex. Crim. App. 2002) in
support of his contention that the evidence regarding the cadaver dogs would confuse
the issues or mislead the jury. Appellant quotes the following footnote:

 The danger of "confusion of the issues" and "misleading the jury" arises
when circumstantial evidence tends to sidetrack the jury into
consideration of factual disputes only tangentially related to the facts at
issue in the current case. The classic explanation of this danger comes
from Dean Wigmore: "The notion here is that, in attempting to dispute
or explain away the evidence thus offered, new issues will arise as to the
occurrence of the instances and the similarity of conditions, [and] new
witnesses will be needed whose cross examination and impeachment
may lead to further issues." 2 John H. Wigmore, Evidence § 443, at
528-29 (Chadbourn rev. 1979). In short, the evidence is a "rabbit trail."


Wiley, 74 S.W.3d at 407 n.21. In Wiley, the appellant, who was charged with arson,
wanted to introduce evidence that another person may have "assisted" an "alternate
perpetrator" set the fire at issue. Id., 74 S.W.3d at 406. However, this other person
was an individual with a severely limited mental capacity and Wiley had testified to
the grand jury that he did not believe the individual could have set the fire. Id. The
court noted that there was no evidence that the individual was involved with the fire,
only speculation that this was so. Id. at 407. Thus, if the trial court had allowed
Wiley to present the evidence of the other individual, "it would have forced the State
to attempt to disprove the nebulous allegation that perhaps [the other individual] was
somehow involved as an assistant to some unknown sophisticated arsonist." Id. Such
evidence would also have turned the jury away from deciding the only issue in the
case--whether Wiley had set the fire--and speculate whether an individual who was
not on trial may have been involved. Id. Here, the evidence was probative of
whether appellant had disposed of Maria's body where he said that he did, and the
evidence did not point to other suspects. Nor did it require the jury to speculate on
an issue that it was not asked to decide in the case. See id. at 407. We hold that the
trial court did not err by overruling appellant's rule 403 objection.

 We overrule appellant's sixth issue. 

Corpus Delicti

 Appellant's seventh issue challenges the trial court's refusal to instruct a
verdict of not guilty due to lack of proof of the corpus delicti. Specifically, appellant
asserts that the State failed to prove the commission of an offense because his
uncorroborated statements alone are not sufficient to show that a crime was
committed.

 A criminal conviction cannot be based upon a defendant's extrajudicial
confession unless the confession is corroborated by independent evidence tending to
establish the corpus delicti. Gonzales v. State, 190 S.W.3d 125, 130 (Tex.
App.--Houston [1st Dist.] 2005, pet. ref'd), cert. denied, Gonzales v. Texas, 127 S.
Ct. 504 (2006). Texas defines corpus delicti as harm brought about by the criminal
conduct of some person. Id. at 130-31. Some evidence, independent of appellant's
statements, must show that the crime actually occurred, though the independent
evidence does not have to identify the defendant as the culprit. Salazar v. State, 86
S.W.3d 640, 644-45 (Tex. Crim. App. 2002). The corroborating evidence need not
prove the underlying offense conclusively; all that is required is that some evidence
makes the commission of the offense more probable than it would be without the
evidence. Cardenas v. State, 30 S.W.3d 384, 390 (Tex. Crim. App. 2000); Chiles v.
State, 988 S.W.2d 411, 414 (Tex. App.--Houston [1st Dist.] 1999, pet. ref'd).

 In this case, there were several pieces of evidence that make it more probable
than not that Maria was murdered. Maria disappeared suddenly in June 1994 without
any explanation to her friends or family. Her bank account was abandoned with a
hundred dollar balance, even though she did not have much money. Despite witness
statements that she carried her bible with her everywhere, it was found at her home. 
Her daily prayer partner of eleven years has not heard or seen her since she
disappeared. She had a job as a nanny that she never returned to after leaving work
the day she was last seen. Her car was found abandoned, unlocked, with her purse
and keys undisturbed inside. Although she had previously visited family in Mexico,
none of her relatives have seen or heard from her since May 1994. Further, appellant
and his wife lived in Maria's home, but did not assist in searching for her after she
disappeared. Tests revealed the possible presence of blood in the kitchen, hallway,
and bathroom of Maria's home. This was consistent with the statement appellant
gave to police that Maria had been murdered in the kitchen and her body moved to
the bathroom. Appellant's car revealed the possible presence of blood in the back
floorboard area. In addition, two cadaver dogs trained to detect the scent of human
remains independently alerted at the same spot that appellant identified as the location
where he disposed of Maria's body. We conclude that these combined circumstances
are some evidence that makes the commission of the murder "more probable than it
would be without the evidence." Cardenas, 30 S.W.3d at 390; Chiles, 988 S.W.2d
at 414; see also Fisher v. State, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993) (finding
sufficient corroborating evidence to prove corpus delicti where victim vanished
suddenly, her personal affairs--such as friendships and her bank account--were
unresolved, she did not have much money with which to leave town, and blood was
found in victim's home). We hold that the trial court did not err by finding sufficient
the proof of the corpus delicti.

 We overrule appellant's seventh issue.

Conclusion

 We affirm the judgment of the trial court.

 



 Elsa Alcala

 Justice


Panel consists of Justices Taft, Alcala, and Hanks.


Publish. Tex. R. App. P. 47.2(b).
1. Pamela McInnis, a serologist, testified that Luminol is a chemical agent used to help
find areas where there might be diluted blood stains that cannot be seen. It is called
a presumptive indicator of the existence of blood because it reacts and glows when
it comes in contact with other substances in addition to blood. 
2. DPS was unable to detect any blood; however, the test did not rule out the presence
of blood.
3. Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). 
4. Specifically, appellant was read the warnings in article 38.22 of the Texas Code of
Criminal Procedure. Article 38.22 prescribes the requirements to make oral custodial
statements admissible at trial and, among other things, codifies the Miranda warnings
required to be given prior to custodial confessions. Tex. Code Crim. Proc. Ann. art.
38.22, § 3(a) (Vernon 2005); Miranda, 384 U.S. at 479, 86 S. Ct. at 1630. However,
article 38.22 requires a fifth warning not explicitly required under Miranda, namely
that the accused "has the right to terminate the interview at any time." Tex. Code
Crim. Proc. Ann. art 38.22, § 2(a).
5. In a capital trial in which the State is seeking the death penalty, and thus prospective
jurors are individually questioned during voir dire, a different test determines when
voir dire begins for the purpose of a timely request of a jury shuffle. Davis v. State,
782 S.W.2d 211, 215 (Tex. Crim. App. 1989); see also Tex. Code Crim. Proc. Ann.
art. 35.17(2) (Vernon 2006) ("In a capital felony case in which the State seeks the
death penalty, the court shall propound to the entire panel of prospective jurors
questions concerning the principles, as applicable to the case on trial, of reasonable
doubt, burden of proof, return of indictment by grand jury, presumption of innocence,
and opinion."). Voir dire begins in a capital felony case in which the State seeks the
death penalty when the court, rather than the parties, begins questioning the venire. 
Davis, 782 S.W.2d at 215. 
6. The Code of Criminal Procedure provides,


 Art. 28.10. Amendment of indictment or information

 

 (a) After notice to the defendant, a matter of form or substance in an
indictment or information may be amended at any time before the date
the trial on the merits commences. On the request of the defendant, the
court shall allow the defendant not less than 10 days, or a shorter period
if requested by the defendant, to respond to the amended indictment or
information.

 

 (b) A matter of form or substance in an indictment or information may also
be amended after the trial on the merits commences if the defendant
does not object.

 

 (c) An indictment or information may not be amended over the defendant's
objection as to form or substance if the amended indictment or
information charges the defendant with an additional or different
offense or if the substantial rights of the defendant are prejudiced.


Tex. Code Crim. Proc. Ann. art. 28.10 (Vernon 2006) (emphasis added). 
7. Section 3(a) of article 38.22 provides,


 No oral or sign language statement of an accused made as a result of custodial
interrogation shall be admissible against the accused in a criminal proceeding
unless:


 (1) an electronic recording, which may include motion picture,
video tape, or other visual recording, is made of the statement;

 

 (2) prior to the statement but during the recording the accused is
given the warning in Subsection (a) of Section 2 above and the
accused knowingly, intelligently, and voluntarily waives any
rights set out in the warning;


 (3) the recording device was capable of making an accurate
recording, the operator was competent, and the recording is
accurate and has not been altered;


 (4) all voices on the recording are identified; and


 (5) not later than the 20th day before the date of the proceeding, the
attorney representing the defendant is provided with a true,
complete, and accurate copy of all recordings of the defendant
made under this article. 


 Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a). 


 The accused must be informed of the following rights under section 2(a):


 (1) he has the right to remain silent and not make any statement at
all and that any statement he makes may be used against him at
his trial;


 (2) any statement he makes may be used as evidence against him in
court;


 (3) he has the right to have a lawyer present to advise him prior to
and during any questioning;


 (4) if he is unable to employ a lawyer, he has the right to have a
lawyer appointed to advise him prior to and during any
questioning; and


 (5) he has the right to terminate the interview at any time.


 Id. § 2(a). For a statement to be admissible, strict compliance with section 3(a) is
required. Woods v. State, 152 S.W.3d 105, 116 (Tex. Crim. App. 2004). 
8. We also note that we have previously held that the trial court did not err by admitting
the audio-taped statement given to Sergeant Muniz.
9. Factors that could affect a trial court's determination of reliability include, but are not
limited to, the following: (1) the extent to which the underlying scientific theory and
technique are accepted as valid by the relevant scientific community, if such a
community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the
existence of literature supporting or rejecting the underlying scientific theory and
technique; (4) the potential rate of error of the technique; (5) the availability of other
experts to test and evaluate the technique; (6) the clarity with which the underlying
scientific theory and technique can be explained to the court; and (7) the experience
and skill of the person(s) who applied the technique on the occasion in question. 
Kelly v. State, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).
10. One other jurisdiction has held that evidence regarding alerts by cadaver dogs at a site
at which a murder victim's body had once been buried met criteria for admissibility
of scientific evidence. Clark v. State, 781 A.2d 913, 936 (Md. Ct. Spec. App. 2001). 
Clark was convicted of the second degree murder of a six-year old child whose body
had not been found. Id. at 918. Nearly seven years after the child's disappearance,
a cadaver dog was used to search a cemetery based largely on a map found in Clark's
truck. Id. at 920-21. Dan, the cadaver dog used at the cemetery, indicated an alert
in the area of a soil disturbance, which was near a headstone marked "Clark." Id. at
921. A second cadaver dog alerted at the same spot two and one-half years after
Dan's initial alert, approximately nine years after the child's disappearance. Id. at
935. However, no body was found. Id. During a pretrial motion in limine, an expert
in the field of forensic anthropology and the identification of human remains
explained, "In light of modern embalming and burial practices, she believed a
properly trained cadaver dog would be able to distinguish a legitimate grave from a
clandestine one within a cemetery because during embalming all body fluids are
drained from the corpse, whereas persons who bury corpses in clandestine graves
usually do not remove body fluids." Id. at 932-33. The Clark court held that because
the Clark plot had been disturbed, appellant was present with his truck and shovel at
the grave site, a second cadaver dog alerted at the same spot, and the spot where the
cadaver dogs alerted matched the spot marked by an asterisk found on a map in
appellant's truck, there was adequate foundation for the admission of the testimony
regarding the officers' interpretations of the cadaver dogs' actions. Id. at 577-78.
11. Appellant specifically identifies several "other explanations" in his brief-- "wild
animals could have brought the body parts on the land . . . or [] floods, leaks or the fill
dirt from another location could cause the scent." These "other explanations" were
used to cross-examine Deputy Pikett, Bickel, and Spurlock.
12. The examination of Deputy Pikett began approximately 10:45 a.m. and all three
witnesses had finished their testimony before the trial court excused the jury for the
day's lunch break.